IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, *et al.*,<br><br>────────────────────────<br><br>sanofi-aventis U.S. LLC<br><br>      Appellant,<br><br>MALLINCKRODT plc,<br><br>      Appellee.<br><br>──────────────────────── | Civil Action No. 22-216-LPS<br><br>Bankruptcy Case No. 20-12522<br>Bankruptcy BAP No. 22-09 |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO INTERVENE

The Official Committee of Unsecured Creditors of Mallinckrodt plc and its affiliated debtors (the "**UCC**") appointed in the chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors in possession (the "**Debtors**") files this motion (the "**Motion**") for an order granting the UCC leave to intervene in the above-captioned appeal (the "**Appeal**") filed by sanofi-aventis U.S. LLC ("**Sanofi**") of the *Opinion* [D.I. 6347] and *Revised Opinion* [D.I. 6378] entered on February 3, 2022 and February 8, 2022, respectively (together, the "**Opinion**"), and the *Findings of Fact, Conclusions of Law, and Order Confirming Fourth Amended Joint Plan of Reorganization (with Technical Modifications) of Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [D.I. 6660] entered on March 2, 2022 (the "**Confirmation Order**"), entered by the United States Bankruptcy Court for the District

of Delaware (the "**Bankruptcy Court**"), Rule 8013(g) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## PRELIMINARY STATEMENT

1. Sanofi's Appeal squarely targets the settlement and allocation (the "**UCC Settlement**" and the "**UCC Allocation**") that were brokered by the UCC and embodied in the *Fourth Amended Joint Plan of Reorganization of Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Amended Plan**"). Speaking on the UCC Settlement and UCC Allocation in the Opinion, the Bankruptcy Court found that they were "integral to the ability of the Debtors to reach a consensus with various creditor constituencies and confirm a plan that provides recoveries to all classes of creditors."[1] The UCC has a direct and substantial stake in the outcome of this Appeal and the Motion should be granted.

2. The UCC, as an estate fiduciary with express statutory authority to appear and be heard on "any issue,"[2] has actively participated in the Chapter 11 Cases since its formation in October 2020. This active participation has included formulating and consummating the UCC Settlement and UCC Allocation; partaking in preconfirmation plan discovery, presenting "extensive evidence"[3] in support of the UCC Settlement and UCC Allocation during the confirmation hearing—including a lengthy and effective cross-examination of Sanofi's expert witness—and challenging Sanofi's legal theories and factual arguments in papers filed with the Bankruptcy Court and during closing arguments.

3. Despite the UCC's conspicuous role in the heavily contested confirmation hearing, including successfully defending Sanofi's unbridled attack on the UCC Settlement and the UCC

---

[1] *See* Docket 6378 at 88-89, n 218, Appendix 1.
[2] *See* 11 U.S.C. § 1109(b).
[3] *See* Note 1, *supra*.

2

Allocation, Sanofi failed to name the UCC as an appellee. An adverse ruling from this Court regarding the Order would prejudice the rights of the UCC and its constituents, cause delays in substantially consummating the Amended Plan, and potentially impair the UCC Settlement, as discussed further below. For those reasons as well as others set forth below, the UCC respectfully requests that the Court grant the UCC leave to intervene in this appeal so that it can protect the significant economic interest of the General Unsecured Creditors the UCC represents.

## BACKGROUND

**A.     The Chapter 11 Cases and Restructuring Support Agreement**

4.     On October 12, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The cases were brought by Mallinckrodt plc and its multiple subsidiaries – in all, 64 separate debtor entities within the Mallinckrodt family of companies.

5.     On October 14, 2020, the Court entered an order authorizing the joint administration of the cases for procedural purposes only. The Chapter 11 Cases were not substantively consolidated and thus they represent 64 separate cases that are being administered simultaneously.[4] The Debtors continue to operate their businesses as debtors in possession.

6.     The Debtors filed the Chapter 11 Cases to address enterprise-threatening litigation. Prior to the Petition Date, the Debtors were faced with an "all-consuming tidal wave of litigation concerning the production and sales of . . . opioid products" that included over 3,034 cases in 50 states brought by governmental and private plaintiffs.[5] While the Debtors said they believed they had "many strong defenses to the opioid plaintiffs' claims," they nonetheless determined that the

---

[4] See *Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Bankr. D.I. 6510], at Art. IV.FF.
[5] See *Declaration of Stephen A. Welch, Chief Transformation Officer, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. D.I. 128] (the "**First Day Declaration**"), ¶ 76.

3

"vast costs of litigating these suits in hundreds of state and federal courts over decades to come is simply not sustainable" given they faced "hundreds of millions of dollars of litigation expense," potential billion-dollar judgments, and ruinous financial and operational consequences.[6] Thus, through these Chapter 11 Cases, the Debtors sought to negotiate a comprehensive settlement with the various organized groups of opioid plaintiffs.[7]

7. The Debtors also faced significant litigation and regulatory threats with respect to sales of Acthar. Acthar comprised over 30% of the Debtors' revenue for FY2019[8] and the Debtors have indicated that the success of the reorganization remains dependent on their ability to continue marketing and selling Acthar.

8. One day before the Petition Date, the Debtors entered into a Restructuring Support Agreement (the "**RSA**") with (i) 50 Attorneys General of states, Washington, D.C., and U.S territories with respect to their opioid claims; (ii) the members of the plaintiffs' executive committee in national multidistrict opioid litigation who largely represented states, local governments and tribal governments; and (iii) holders of more than 84 percent of the Debtors' guaranteed unsecured notes.

**B.     The Debtors' Non-Opioid General Unsecured Creditors**

9. The Debtors' first day filings also described Mallinckrodt's general unsecured creditors, who were not parties to the RSA. The claims of the General Unsecured Creditors[9] are unusually diverse – the result, in part, of the Debtors' multiple business segments and their highly complex corporate structure. The First Day Declaration disclosed that these General Unsecured

---

[6] See *id*., ¶¶ 82, 91.
[7] See *id.*, ¶¶ 92-93.
[8] See *id*., ¶ 37.
[9] The "**General Unsecured Creditors**" are the Holders of General Unsecured Claims and include unsecured creditors other than opioid creditors and guaranteed unsecured noteholders.

4

Creditors include: (i) unsecured, funded debt claims; (ii) litigation claims, including claims arising from the sale of Acthar, generics price fixing claims, and asbestos claims; and (iii) other general unsecured claims, including certain trade claims.[10]

10. From across these three broad categories of General Unsecured Creditors, the Office of the United States Trustee for Region 3 (the "**U.S. Trustee**") appointed the following four members of the UCC pursuant to pursuant to Bankruptcy Code section 1102(a)(1):  (i) Acument Global Technologies, Inc., which holds claims arising out of the Debtors' sale of Acthar; (ii) Commodore Bowens, Jr., as Administrator for the Estate of Commodore Bowens, which holds claims for asbestos-related injuries arising out of the Debtors' legacy operations; (iii) U.S. Bank Trust National Association, which serves as the trustee for two types of unsecured debt, (a) 4.75% unsecured notes due April 2023 that were issued by Mallinckrodt International Finance, S.A., and guaranteed only by Mallinckrodt plc, and (b) 8.00% and 9.50% legacy debentures due March 2022 and March 2023 that were issued by a predecessor to Ludlow LLC and not guaranteed by any Debtor; and (iv) AFSCME District Council 47 Health and Welfare Fund, which holds claims arising out of the Debtors' pricing and sale of generics products as well as claims arising out of the Debtors' sale of Acthar.[11]

11. As discussed in greater detail below, these members have been actively engaged in all aspects of the Chapter 11 Cases, including participating in weekly calls with their legal and financial advisors since shortly after the UCC was organized.

---

[10] The General Unsecured Creditors hold claims against many different Debtor entities [Bankr. D.I. 306].

[11] When originally appointed, the UCC also included New PharmaTop LP.  Following the closing of the Debtors' restructuring transaction concerning certain intellectual property, through which any general unsecured claim of New PharmaTop LP was paid in full and its contract assigned through the transaction, New PharmaTop LP resigned from the UCC.  See *Order Authorizing Intercompany Restructuring Transactions* [Bankr. D.I. 633].

## C. The Initial Plan and UCC's Preliminary Objection

12. On April 20, 2021, and long before Sanofi became actively involved in the Chapter 11 Cases, the Debtors filed their *Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Bankr. D.I. 2074] (together with all schedules and exhibits thereto, the "**Initial Plan**"). The Initial Plan, like the RSA, proposed to allocate $100 million to a single class of "General Unsecured Claims (Not Otherwise Classified)" creditors ("**Class 6 Creditors**") without recognizing the highly diverse nature of the claims held by the Class 6 Creditors or the 64 different Debtor entities that could be liable to the Class 6 Creditors.[12] Although the Initial Plan alluded to a distribution mechanism that would allocate portions of the consideration to individual Debtor entities, it did not disclose what the mechanism would be.[13] This made it impossible for Class 6 Creditors to properly evaluate proposed recoveries under the Initial Plan.

13. On May 18, 2021, the UCC filed its preliminary objection to the Debtors' motion to approve the disclosure statement with respect to the Initial Plan [Bankr. D.I. 2392] (the "**Preliminary Objection**"), alleging that: (i) the pool of $100 million for Class 6 Creditors was insufficient as compared to the higher recoveries proposed to be provided to other classes of unsecured creditors, and (2) the amounts of the proposed distributions to Class 6 Creditors were impossible to determine.

## D. The Revised Plan and the UCC's Supplemental Objections

14. On June 8, 2021, the Debtors filed a revised plan [Bankr. D.I. 2767] (the "**Revised Plan**") and revised disclosure statement [Bankr. D.I. 2769] the ("**Revised Disclosure Statement**"). The Revised Plan reclassified claims held by Class 6 Creditors from a single class

---

[12] See *Initial Plan* at Art. III.A.
[13] See *id*., at Art. I.A.110, Art. III.B.6.

into six subclasses: Class 6(a) (Acthar Claims); Class 6(b) (Generics Price Fixing Claims); Class 6(c) (Asbestos Claims); Class 6(d) (Legacy Unsecured Notes Claims, which included the 4.75% Unsecured Notes Claims); Class 6(e) (Environmental Claims); and Class 6(f) (Other General Unsecured Claims).[14]

15. Like the Initial Plan, the Revised Plan offered $100 million (in cash and/or equity, at the Debtors' discretion) to satisfy all claims held by Class 6 Creditors. However, unlike the Initial Plan, which contemplated allocating the $100 million on a debtor-by-debtor basis, the Revised Plan proposed to allocate the $100 million of value to each subclass based on the size of the allowed claims. This proposal would have deferred distribution of funds until all of the Class 6 claims were reconciled and did not address the fact that the subclasses held claims against different Debtor entities.

16. On June 14, 2021, the UCC filed a *Supplemental Objection to the Revised Disclosure Statement* [Bankr. D.I. 2852] (the "**Supplemental Objection**"), renewing certain objections in its Preliminary Objection and maintaining that (a) the $100 million distribution to Class Six Creditors was insufficient and (b) although the Revised Plan now separated Class 6 Creditors into separate subclasses, it nonetheless improperly consolidated those creditors for distribution purposes without taking into account the 64 Debtor entities at which each Class 6 Creditor held a claim.

E.  **The UCC Settlement, UCC Allocation, and the Amended Plan**

17. Running parallel with Revised Plan challenges, the UCC began participating in a months-long mediation with the Debtors and other key creditor constituencies[15] before the

---

[14] See *Revised Plan* at Art. III.B.6.
[15] In addition to the UCC and the Debtors, the mediation parties included (i) the ad hoc group of guaranteed unsecured noteholders whose consent was required under the RSA for any settlement that would increase the amount of consideration available to General Unsecured Creditors; (ii) certain members of the UCC; (iii) Attestor

Honorable Bankruptcy Judge Christopher S. Sontchi. The mediation continued throughout the summer and addressed a variety of complex, interrelated issues, including, among others: (i) the Debtors' total enterprise value ("**TEV**"); (ii) the TEV percentage that should be available for distribution to Class 6 Creditors; (iii) the Class 6 Creditor claim reconciliation process, particularly with regard to the reconciliation of Acthar claims; and (iv) the allocation of settlement consideration among the Class 6 Creditor subclasses.

18.     The mediation culminated in the UCC Settlement and the UCC Allocation. The UCC Settlement had two principal monetary components: cash consideration—which had increased from $100 million to $135 million—that would be paid into a General Unsecured Creditors Trust (the "**GUC Trust**") (with a portion of the settlement consideration being separately directed to a qualified settlement fund for the benefit of asbestos claimants) on the Effective Date of the Amended Plan, plus additional assets that would increase the total amount available to Class Six Creditors by an additional estimated $45 million to $85 million.

19.     Inextricably linked to the settlement consideration embodied in the UCC Settlement was the UCC Allocation: the process by which settlement consideration would be allocated among the Class 6 Creditor subclasses. The UCC Allocation took, as a starting point, certain financial modeling of theoretical recoveries to each subclass, completed by the UCC's financial professionals (the **"UCC Waterfall"**) and then adjusted theoretical recoveries (or opted not to adjust) recoveries based on a range of factors, including: (i) the liquidated or unliquidated, contingent or noncontingent, and disputed or undisputed nature of the claims; (ii) the Debtor entity or entities the Class 6 Creditor claims were asserted against; (iii) the estimated relative value

---

Limited, an investor in litigation against the Debtors that had purchased interests in certain Acthar claims of insurance companies or pharmacies; (iv) the Ad Hoc Acthar Group, which consists of holders of third party payor Acthar claims; and (v) Aurelius Capital Management LP, a significant individual holder of 4.75% Unsecured Note Claims.

available at such entities; (iv) the sources of recovery for a particular subclass (including, for example, insurance as to which that subclass might have a particularly strong claim); and (v) the willingness of a subclass to accept a fixed recovery and to forgo potential "upside" from the proceeds of the non-cash assets. Based on these considerations, the UCC Settlement and UCC Allocation provided for initial cash distributions to all Class 6 Creditor subclasses, some of which are subject to claim reconciliation, and provides certain subclasses with further distributions based on the cash proceeds generated from the monetization of non-cash assets vested in the GUC Trust, also subject to claim reconciliation.

20.     Following the UCC's approval of the UCC Settlement and UCC Allocation, the Debtors and the UCC worked to incorporate the terms of the UCC Settlement into the Amended Plan, which the Debtors filed on September 29, 2021 [Bankr. D.I. 4508].

### F.     Confirmation of the Amended Plan

21.     Given the complexity and breadth of the issues to be addressed at confirmation, the hearing on confirmation of the Amended Plan was divided into two phases: Phase I focused on issues related to: valuation, notice and voting, the make-whole and cramdown dispute, and other issues addressed by the declarations of certain experts proffered by the Debtors in support of the Plan;[16] Phase II focused on issues related to, among other things, the development and negotiation of the Amended Plan and the UCC Settlement and UCC Allocation.[17]

22.     Phase I of the Confirmation Hearing began on November 1, 2021, and ran five days to completion, at which point the Bankruptcy Court pivoted to addressing issues raised by certain Acthar claimants with respect to the nature and priority of their claims. Phase II then commenced

---

[16] See *Final Pretrial Order for Phase I of the Plan Confirmation Hearing*, D.I. 5510 at 6-7.
[17] See *Corrected Third Amended Proposed Final Pretrial Order for Phase II of the Plan Confirmation Hearing*, D.I. 5555 at 6-7.

on December 6, 2021, and continued for 10 days, after which, beginning on January 3, 2022, the Bankruptcy Court heard three days of closing arguments. All parties to the proceedings, including Sanofi, were given the opportunity to fully participate, as appropriate, at each stage of both phases of the confirmation proceedings.

23. While testimony given by certain of the Debtors' witnesses during Phase II supports the UCC Settlement and UCC Allocation, the UCC also called four of its own witnesses offering fact and expert testimony with respect to the analysis underlying the UCC's decision to enter into the UCC Settlement and in support of the various assumptions underlying the UCC Allocation. This testimony was supported by numerous exhibits entered into the record by both the Debtors and UCC over the course of the trial. All parties to the proceedings, including Sanofi, were given the opportunity to cross examine each of these witnesses. Furthermore, Sanofi called its own expert witness, John P. Madden, to testify as to what Sanofi asserted were flaws in the UCC Waterfall and UCC Allocation, who was cross-examined by the UCC.

24. For the reasons meticulously detailed in the Bankruptcy Court's 103-page Opinion, the Bankruptcy Court found that the Plan, of which the UCC Settlement and the UCC Allocation were key elements, met the requirements of section 1129 of the Bankruptcy Code. Sanofi's objections to the Amended Plan were overruled.

**G.   The Appeal**

25. On February 17, 2022, Sanofi filed a *Notice of Appeal and Statement of Election* [Case No. 20-12522, Bankr. D.I. 6489] (the "**Notice of Appeal**") in the Bankruptcy Court. According to the Statement Of Issues On Appeal [Docket No. 6676] (the "**Statement of Issues**") that Sanofi filed in the Appeal, Sanofi's target is the UCC Settlement and the UCC Allocation, asking:

> Whether the Bankruptcy Court erred by confirming the Joint Plan over the objection and rejection by creditors in Class 6(f) of MP Ireland, by approving the Initial Fixed Distribution, which (a) violates the "absolute priority rule" embodied in section 1129(b)(2)(B)(ii) of the Bankruptcy Code and (b) and unfairly discriminates in violation of section 1129(b)(1) of the Bankruptcy Code, including by failing to require an appropriate disputed claims reserve and by improperly concluding that the settlement proceeds constitutes a "gift" of anticipated reorganization securities from another class of unsecured creditors.

26. The Notice of Appeal failed to list the UCC as an interested party. In addition, Sanofi soon after filed a motion for stay pending appeal of the Confirmation Order [Bankr. D.I. 6685] (the "**Motion for Stay**") and a motion for certification of direct appeal to the Third Circuit Court of Appeals [Bankr. D.I. 6686] (the **"Motion for Certification"**).

27. On February 18, 2022, the Notice of Appeal was docketed in this Court. *See* Docket No. 2.

28. The UCC filed its objections to the Motion for Certification and Motion for Stay on March 17, 2022 [Bankr. D.I. 6809 and 6812, respectively].

29. The hearing on the Motion for Stay and Motion for Certification is currently scheduled to occur on March 24, 2022.

## RELIEF REQUESTED

30. By this Motion, the UCC seeks leave of the Court to intervene in the above-captioned bankruptcy appeal.

## ARGUMENT

31. Bankruptcy Rule 8013(g) governs motions for intervention filed by interested parties in bankruptcy appeals, providing in pertinent part that:

> [An intervening party] must move to intervene… within 30 days after the appeal is docketed. [The Motion] must concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why

> intervention is being sought at this stage of the proceeding, and why participating as an amicus curiae would not be adequate.

Fed. R. Bankr. P. 8013(g); *see also Official Committee of Unsecured Creditors v. Constellation Enterprises LLC (In re: Constellation Enterprises LLC)*, 587 B.R. 275, 285 (D. Del. 2018) (outlining the legal standards for intervention under Bankruptcy Rule 8013(g)). As set forth below, the UCC satisfies each of these criteria.

32.  <u>Filing Within 30 Days</u>.  The Notice of Appeal was docketed with this Court on February 18, 2022.  Accordingly, this Motion has been filed within 30 days of the docketing of the appeal and is therefore timely under Bankruptcy Rule 8013(g).[18]

33.  <u>Movant's Interest</u>.  The UCC has an important interest in the Appeal.  The UCC is an estate fiduciary, duly appointed by the Office of the United States Trustee pursuant to Bankruptcy Code section 1102(a)(1), to act for the benefit and on behalf of General Unsecured Creditors.[19] The UCC was also the architect of the UCC Settlement and UCC Allocation, both of which were "integral to the ability of the Debtors to reach a consensus with various creditor constituencies and confirm a plan that provides recoveries to all classes of creditors."[20]  Despite this, Sanofi, for reasons we cannot discern, omitted naming the UCC in its appeal, which attacks the UCC Settlement and UCC Allocation and seeks to reverse confirmation based on the UCC Settlement and UCC Allocation.[21]

---

[18] While March 20, 2022, a Sunday, was the thirtieth day from the filing of the Appeal, Fed. R. Civ. P. 6(a)(1)(c) extends the time by which this Motion must be filed to the next business day, Monday, March 21, 2022.

[19] In addition to Class 6 Creditors, the UCC represents trade creditors classified in Class 7.  The Fourth Amended Plan proposes paying Class 7 creditors 100% of their prepetition claims and Class 7 treatment to the extent such Class 7 creditor voted to accept the Plan. Those that voted to reject the Plan, will be represented as Class 6 Creditors.

[20] *See* Docket 6378 at 88-89, n 218, Appendix 1.

[21] *See* Sanofi's *Statement of Issues on Appeal* [Bankr. D.I. 6676], *Motion of sanofi-aventis U.S. LLC for Certification of Direct Appeal Under 28 U.S.C> § 158(d)(2)* [Bankr. D.I. 6686 at ¶¶ 3-4], and *Motion for Stay Pending Appeal* [Bankr. D.I. 6685 at ¶¶ 5-7].

34. The UCC must be permitted to participate on appeal and represent the interests of General Unsecured Creditors with respect to the UCC Settlement and UCC Allocation, just as it participated in the bankruptcy proceedings in advancing and introducing evidence to show that Sanofi's positions have no merit. Absent intervention, the UCC is unable to ensure that the legal arguments and evidence it introduced at Phase II of the Confirmation Hearing will be advanced at the appellate stage of the proceeding, including critical testimony and documentary evidence regarding the UCC Settlement and UCC Allocation, into which the UCC has unique insight. Further, the UCC must be permitted to intervene to ensure its participation in any potential settlement discussions that may affect the UCC Settlement and UCC Allocation.

35. <u>Grounds for Intervention</u>. No other party in interest, including the Debtors, can adequately represent the UCC's interests in connection with the Appeal, including defending the UCC Settlement and UCC Allocation. While the UCC fully supports the Debtors' efforts to defend confirmation of the Amended Plan, the possibility exists that the UCC and the Debtors will not uniformly align on matters of appellate strategy, including matters pertaining to the UCC Settlement and UCC Allocation. For instance, the UCC and the Debtors have already taken differing positions on aspects of the Motion for Stay. Thus, the UCC must be a party to the Appeal to independently evaluate any process from its perspective as an estate fiduciary representing General Unsecured Creditors. Additionally, to the extent the Debtors and Sanofi enter into future settlement discussions, it is imperative the UCC be "at the table." Only by playing an active role in the shaping of any settlement proposal, as opposed to merely awaiting a final resolution, can the UCC ensure that any such settlement proposal protects the interests of the General Unsecured Creditors.

36. <u>Intervention Was Permitted in the Bankruptcy Court</u>. As noted above, the UCC is an estate fiduciary, representing the interests of the Class 6 Creditors. Moreover, the UCC has express statutory authority pursuant to section 1109(b) of the Bankruptcy Code to raise, appear and be heard "on any issue" in the Chapter 11 Cases. As noted, *supra*, the UCC has been an active participant in all aspects of the Chapter 11 Cases, including on all matters related to confirmation of the Amended Plan, the UCC Settlement and UCC Allocation.

37. <u>Intervening at the Current Stage</u>. The UCC is seeking intervention now, following active participation at confirmation, only because Sanofi has declined to name the UCC as an appellee, as good practice recommends. "Even though courts have declined to require the appellant to name each appellee in the notice of appeal, we do not think it is good legal practice to fail to do so." *House v. Belford*, 956 F.2d 711, 717 (7th Cir. 1992). Bankruptcy Rule 8013(g) permits intervention within 30 days of the docketing, and the Motion has been filed within this time period. Moreover, to date, no substantive activity has occurred on the merits since docketing of the Appeal and, in fact, the UCC has actively engaged with Sanofi and other appealing creditors regarding legal briefing in this and other related appeals.

38. <u>Participation as *Amicus Curiae* is Inadequate</u>. Participating merely as *amicus curiae* would not afford the UCC the ability to protect its significant economic interests in this Appeal. Bankruptcy Rule 8017 places significant limitations on the involvement of *amici curiae*. An *amicus curiae* is not a party to the litigation, and therefore, its standing to appeal any decision by this Court, if necessary, may be questioned. Further, the ability of *amici curiae* to file any substantive motions, such as a motion to dismiss, may be limited. As an estate fiduciary and statutory party in interest authority under section 1109(b) of the Bankruptcy Code with a significant economic interest in the outcome of this Appeal, the UCC should be permitted to

participate in every aspect of this Appeal, both substantively and procedurally, without any limitations that could be imposed on parties who are participating as *amici curiae*.

39. Based upon the foregoing, the UCC respectfully submits that Bankruptcy Rule 8013(g) is satisfied, and that the relief requested herein is appropriate under the circumstances and should be granted.

## LOCAL RULE 7.1.1. STATEMENT

40. Pursuant to Rule 7.1.1. of the Local Rules of Civil Procedure and Procedure of the United States District Court for the District of Delaware, the undersigned counsel to the UCC has discussed and/or corresponded with counsel to Sanofi and counsel to the Debtors regarding this Motion. The undersigned counsel to the UCC understands from counsel to Sanofi that it will likely file a limited objection and/or reservation of rights and from counsel to the Debtors that they do not object to the Motion.

WHEREFORE, the UCC respectfully requests that the Court enter an order granting it leave to intervene as appellee and granting such other relief as is just and proper.

Dated: March 21, 2022
Wilmington, Delaware

*/s/ Jamie L. Edmonson*
Natalie D. Ramsey (No. 5378)
Jamie L. Edmonson (No. 4247)
**ROBINSON & COLE LLP**
1201 N. Market Street, Suite 1406
Wilmington, DE 19801
Tel: (302) 295-4800
Fax: (302) 351-8618
Email: nramsey@rc.com
         jedmonson@rc.com

-and-

Patrick M. Birney (admitted *pro hac vice)*
John L. Cordani (admitted *pro hac vice*)
280 Trumbull Street
Hartford, CT 06103
Tel: (800) 826-3579
Fax: (860) 275-8299

-and-

Cullen D. Speckhart, Esq. *(admitted pro hac vice)*
**COOLEY LLP**
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
Tel: (202) 842-7800
Fax: (202) 842-7899

-and-

Cathy Hershcopf, Esq. *(admitted pro hac vice)*
Michael Klein, Esq. *(admitted pro hac vice)*
Evan M. Lazerowitz (*admitted pro hac vice*)
55 Hudson Yards
New York, New York 10001
Tel: (212) 479-6000
Fax: (212) 479-6275

*Counsel to the Official Committee of Unsecured Creditors of Mallinckrodt plc, et al.*