IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MALLINCKRODT PLC, *et al.*<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 20-12522 (JTD)<br>)<br>) (Jointly Administered)<br>)<br>) District Court Case No. 22-cv-00216 (TLA)<br>)<br>) Bankruptcy BAP No. 22-09<br>) |

## MOTION FOR STAY PENDING APPEAL

Pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), appellant sanofi-aventis U.S. LLC ("**Sanofi**") requests a stay pending appeal of certain severable provisions of the *Debtors' Fourth Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* ("**Joint Plan**") [D.I. 6066],[1] confirmed by the United States Bankruptcy Court for the District of Delaware ("**Bankruptcy Court**"). Sanofi seeks a limited stay, solely with respect to the authorization of the Debtors or the GUC Trustee (defined below) to disburse the "Initial Fixed Distribution" (defined below) pending further order of the Court.

## PRELIMINARY STATEMENT

1. The Joint Plan evidences a multi-billion-dollar reorganization of more than sixty debtor entities ("**Debtors**"), centered around a $1.725 billion settlement of opioid-related claims ("**Opioid Settlement**"). Sanofi neither appeals approval nor seeks to stay the implementation of the Opioid Settlement.

---

[1]  Docket references herein refer to documents filed in the Bankruptcy Court, Case No. 20-12522(JTD).

2. Instead, Sanofi seeks review of the allocation and Effective Date distribution of proceeds of a settlement ("**UCC Settlement**") among the Debtors and the Official Committee of Unsecured Creditors ("**UCC**"), pursuant to which the Debtors will deliver $135,000,000 and certain intangible assets ("**Settlement Proceeds**") to a trust ("**GUC Trust**" or "**GUC Trustee**," as applicable) for the benefit of creditors in Classes 6(a) through 6(g) of all Debtors.[2]

3. The record reflects that *after* the Debtors and the UCC achieved the UCC Settlement, the UCC's professionals conducted follow-on negotiations with each UCC committee member, who separately agreed to a specific allocation of the Settlement Proceeds ("**UCC Allocation**"). Critically, as a result of such negotiations, the UCC Allocation includes an *Effective Date* disproportionate disbursement of approximately $94,000,000 of the $125,000,000 cash component of the Settlement Proceeds to select Class 6 subclasses ("**Initial Fixed Distribution**").

4. Sanofi is an unsecured creditor in Class 6(f) of Mallinckrodt Pharmaceuticals Ireland Limited ("**MP Ireland**"), which voted to reject the Joint Plan. Tellingly, no UCC member holds a claim in Class 6(f) or against MP Ireland.

5. Sanofi objected to confirmation of the Joint Plan, including the UCC Allocation and Initial Fixed Distribution, because the UCC Allocation violates the absolute priority rule and unfairly discriminates against Class 6(f) creditors of MP Ireland. Specifically the UCC Allocation ascribes material value to MP Ireland; however, by significantly and unreasonably underestimating the extent of claims against MP Ireland, the UCC Allocation presumes that MP Ireland's creditors will be paid in full (despite that they are "impaired" under the Joint Plan) so that excess value from MP Ireland may then be up-streamed by dividend to Mallinckrodt

---

[2]   Of the Settlement Proceeds, $10,000,000 will be reserved for GUC Trust expenses.

International Finance (SA) ("**MIFSA**"), MP Ireland's equity holder.  The Initial Fixed Distribution locks in this dividend by providing an immediate $57,000,000 distribution to Class 6(g) creditors on account of their claims against MIFSA.

6. Only in their responses to such objections did the Debtors and UCC first assert that the Settlement Proceeds should be deemed a "gift" from the recovery to which Class 5 "Guaranteed Unsecured Noteholders" would be entitled. The Debtors proffered a waterfall concluding that creditors in Class 6 would receive more under the Joint Plan than they would otherwise.  The Debtors relied on this analysis in urging the Bankruptcy Court not to analyze or address the mechanics or outcome of the UCC Allocation.  The Bankruptcy Court erroneously adopted the Debtors' position, referring in a conclusory manner to the Settlement Proceeds as a "gift" and ignoring how the UCC Allocation operates.

7. Sanofi appeals confirmation of the Joint Plan only with respect to the UCC Allocation and Initial Fixed Distribution.[3]  Sanofi asks this Court to reject the UCC Allocation and Initial Fixed Distribution, and instead direct distribution of the Settlement Proceeds to Class 6 creditors *pro rata*, rather than the preferential and discriminatory allocation devised by the UCC members. Specifically, the Settlement Proceeds should first be allocated appropriately among the several Debtors and Class 6 claims should be reconciled, or an appropriate disputed claims reserve established, before making distributions.

8. Sanofi does not seek to stay the occurrence of the Effective Date or the Debtors' implementation of the UCC Settlement, i.e., delivery of the Settlement Proceeds to the GUC Trustee, or the GUC Trustee's liquidation of intangible assets.

---

[3] Not relevant to this motion, Sanofi also appeals determinations by the Bankruptcy Court in the Revised Opinion regarding the "validity" of an amended proof of claim filed by Sanofi.

9. Sanofi seeks a limited stay; to wit: that the GUC Trustee be stayed from disbursing the Settlement Proceeds pending further order of the court after Sanofi's appeal is decided.

10. The requested narrow stay prejudices no party and is warranted under the circumstances of these cases.

## BACKGROUND

### A. The Joint Plan

11. On June 18, 2021, the Debtors filed the solicitation version of their plan [D.I. 2916] ("**Solicited Plan**").

12. Under the Solicited Plan, Class 5 claimants (Guaranteed Unsecured Notes Claims) would receive the equity of the Reorganized Debtors. Each creditor in each subclass within Class 6 would receive a "General Unsecured Claims Distribution," generally defined as a *pro rata* share of $100,000,000.

13. The UCC objected to the Disclosure Statement [D.I. 2392] ("**UCC Objection**"), because, they alleged the Debtors' proposed settlements of their opioid liabilities only asserted against certain Debtor entities impermissibly siphoned value from Debtors not burdened with opioid liabilities. The UCC further objected that the "Plan proposes to ignore that each Debtor must be valued independently, and instead unfairly shifts value away from General Unsecured Creditors and into the pockets of [Class 5] Guaranteed Unsecured Noteholders . . . and the opioid claimants . . ." UCC Objection, ¶5.

14. After the voting deadline, the Debtors filed a "First Amended" plan [D.I. 4508],[4]

---

[4] The Debtors filed further amendments, culminating in the "Joint Plan" that was confirmed by the Bankruptcy Court. The Joint Plan and the "First Amended" Plan are substantively identical with respect to the

under which the Class 5 Guaranteed Unsecured Noteholders would still receive the equity of the Reorganized Debtors, but the treatment for the Class 6 subclasses materially changed, as the UCC Settlement was incorporated for the first time.

15. The UCC Settlement increased the pot for Class 6 Claimants from $100,000,000 to $135,000,000 in cash plus certain intangible assets and the proceeds thereof. But no longer were Class 6 Claimants to receive a *pro rata* recovery. Instead, the UCC Settlement permitted the UCC to dictate the allocation and disbursement of the Settlements Proceeds. The UCC then independently devised the UCC Allocation, including the Initial Fixed Distribution, which ignores the absolute priority rule and treats some subclasses far more favorably than others.[5]

16. Sanofi timely filed two confirmation objections [D.I. 4702 and 5101].

17. The UCC Allocation is based on inaccurate assumptions as to the size of the potential allowed claims pools for several Class 6 subclasses at various Debtors, but without the benefit of determinations under Bankruptcy Rule 3018 or section 502(c) of the Bankruptcy Code. Creditor recoveries within the Class 6 subclasses would be materially better for some and materially worse for others, if the Joint Plan instead provided for valuation and allocation of the Settlement Proceeds by the Bankruptcy Court with *pro rata* distributions among class 6 creditors based on actually allowed claims.[6]

---

UCC Settlement and are referred to generally as the "Joint Plan."

[5] The Bankruptcy Court never determined that the Joint Plan, including the UCC Allocation, treats all creditors better than the Solicited Plan, despite Sanofi's and other objections. The Joint Plan with such changes was never solicited. *See*, *e.g.*, 11 U.S.C. § 1127; Fed. R. Bankr. P. 3019; *In re USN Commc'ns, Inc.*, 280 B.R. 573, 595 (Bankr. D. Del. 2002) (material modifications require re-solicitation of ballots). Indeed, the only subsequent communication to Class 6 creditors was a letter sent by the UCC that specifically advised that the allocation of the Settlement Proceeds could by adjusted by the Bankruptcy Court to ensure compliance with the Bankruptcy Code. *See* [D.I. 4540], attached hereto.

[6] Creditors holding claims at subsidiaries with value should receive their *pro rata* share of that value before any value of such subsidiary is paid by dividend to any equity holder of such subsidiary. Upstreaming value before claims at such subsidiary Debtors are paid or provided for in full violates the absolute priority rule.

18. The Class 6 recoveries at each Debtor are set forth on an appendix to the Amended Plan that purports "to describe the methodology by which recoveries per the UCC Settlement are allocated to each sub-class of Allowed Class 6 Claims and [certain] Allowed Class 7 Claims . . . ." Amended Plan, p. 178 of 187.

19. The UCC Allocation starts with the "UCC Waterfall," which models how the Debtors' enterprise value should be allocated to each Debtor and to creditors of each Debtor under the absolute priority rule. The UCC Waterfall includes assumptions: (a) total enterprise value of all Debtors, (b) relative value of each Debtor, and (c) estimated allowed claims pools at each Debtor.

20. From the UCC Waterfall, the UCC created the following table that "illustrates estimated recoveries" to the various Class 6 subclasses (not broken out by Debtor):

Table 1

| Sub-class | Est. Share of Aggregate Class 6 Entitlements |
|---|---|
| 6(a) – Acthar Claims | 29.0% |
| 6(b) – Generics Price Fixing Claims | 6.0% |
| 6(c) – Asbestos Claims | 1.9% |
| 6(d) – Legacy Unsecured Notes Claims | 5.4% |
| 6(e) – Environmental Claims and 6(f) – Other General Unsecured Claims | 29.2% |
| 6(g) – 4.75% Unsecured Notes Claims | 28.5% |
| Total | 100.0% |

21. The appendix next allocates value among the Class 6 subclasses (not broken out by Debtor) as follows, based on the output from the UCC Waterfall:

-6-

| Sub-class | Est. Share of Aggregate Class 6 Entitlements | | @ Net Consideration ($ millions) | | |
|---|---|---|---|---|---|
| | @ Net Consideration ≤ 282[11] (per Table 1) | @ Net Consideration = 300[12] | 125 | 200 | 300 |
| 6(a) – Acthar Claims | 29.0% | 29.1% | 36.2 | 58.0 | 87.3 |
| 6(b) – Generics Price Fixing Claims | 6.0% | 6.0% | 7.5 | 11.9 | 17.9 |
| 6(c) – Asbestos Claims | 1.9% | 1.9% | 2.4 | 3.8 | 5.8 |
| 6(d) – Legacy Unsecured Notes Claims | 5.4% | 5.1% | 6.8 | 10.9 | 15.3 |
| 6(e) – Environmental Claims and 6(f) – Other General Unsecured Claims | 29.2% | 29.3% | 36.5 | 58.4 | 87.9 |
| 6(g) – 4.75% Unsecured Notes Claims | 28.5% | 28.6% | 35.6 | 57.0 | 85.8 |
| Total | 100.0% | 100.0% | 125.0 | 200.0 | 300.0 |

22. The UCC then arbitrarily applied "allocation steps" to arrive at the following "Initial Fixed Distribution," which the Bankruptcy Court erroneously approved:

| Sub-class | Initial Fixed Distributions ($ millions) |
|---|---|
| 6(a) – Acthar Claims | 7.5 |
| 6(b) – Generics Price Fixing Claims | 8.0 |
| 6(c) – Asbestos Claims | 18.0 |
| 6(d) – Legacy Unsecured Notes Claims | 10.9 |
| 6(e) – Environmental Claims and 6(f) – Other General Unsecured Claims | 23.6 |
| 6(g) – 4.75% Unsecured Notes Claims | 57.0 |
| Total | 125.0 |

If claims in MP Ireland's Class 6(f) exceed $90,000,000, as assumed by the Court, then at least $71,250,000 (57% of $125,000,000) should have been allocated to Class 6(f), because under the UCC Waterfall, MP Ireland comprises 57% of the Debtors' total value.

**B. The Initial Fixed Distribution – Flawed Assumptions, Flawed Process**

23. The Initial Fixed Distribution does not follow the *pro rata* allocation reflected in Table 1. For example, Class 6(c)'s estimated share of the pot was calculated to be 1.9% ($3,800,000 if Settlement Proceeds ultimately reach $200,000,000), but its initial distribution is $18,000,000, nearly five times the best-case *pro rata* recovery; Class 6(a)'s projected share is 29.0%, but only gets 6% of the Initial Fixed Distribution; Class 6(f)'s projected share is 29.2%, but only receives a share of 18.4%.

24. The record reflects the UCC's financial advisor's testimony that the UCC Allocation and the Initial Fixed Distribution were the products of negotiations conducted by the UCC's professionals with each member of the UCC after the UCC and the Debtors achieved the UCC Settlement. As the Debtors also admit: "After the UCC Settlement, the UCC further mediated among [the UCC members], which resulted in the allocation set forth in the UCC Appendix attached as Exhibit 6 to the Plan (the "**UCC Allocation**"). (*Debtors' Omnibus Opposition to Motions for a Stay Pending Appeal* [D.I. 6808], ¶15).

25. The UCC's *articulated* unpersuasive rationale for favoring some Class 6 subclasses over others is that some claims are liquidated, while the less favored are not. Virtually all (75%) of the Initial Fixed Distribution will be distributed to the favored "liquidated" claimants, which necessarily forces the "unliquidated claimants" – primarily those in Classes 6(a) and 6(f) – to hope to recover later from intangible assets.[7] Shifting such substantial risk and delay to structurally senior creditors, while paying structurally junior creditors in cash on the Effective Date from borrowed value is discriminatory.

26. Equally problematic, the UCC Waterfall is premised on unsupportable estimates of allowed claims pools. The reconciliation of claims, specifically for Class 6(f), will have a dramatic impact on the *pro rata* recovery projected by the UCC Waterfall. The confirmation process involved no claims estimation process for unliquidated or disputed claims.[8]

27. The UCC Waterfall ascribes more than $4 billion of the Debtors' total $7.2 billion value to MP Ireland. The UCC Waterfall, however, grossly underestimates the amount

---

[7] There is no evidence that the intangible assets will yield sufficient value to permit MP Ireland Class 6(f) creditors to be paid in full. Notwithstanding, substantial value will be distributed on the Effective Date to the *structurally junior* Class 6(g) creditors.

[8] The deadline to bring a Rule 3018 motion passed before the UCC Settlement was achieved or the "First Amended" Plan filed, foreclosing creditors' rights to liquidate their claims.

of Class 6(f) claims against MP Ireland at only $14,000,000 and, thus, "predicts" that Class 6(f) claims at MP Ireland will be paid **in full**, with the balance of ascribed MP Ireland value then flowing up to MIFSA. More dramatic is the omission of any disputed claims reserve to protect MP Ireland's Class 6(f) creditors, to assure their allowed claims are paid in full before substantial value is transferred by way of illegal dividend to MIFSA.[9]

28.     The evidence demonstrated that an estimated claim pool of $14,000,000 was grossly inadequate. The Debtors' own professionals testified that they estimated Sanofi's MP Ireland Class 6(f) claim to be at least $45,000,000, with similar testimony for another large royalty claim. Those two estimates alone show that allowed MP Ireland Class 6(f) claims are nearly 650% more than the UCC's estimated $14,000,000.[10]

29.     Sanofi objected, arguing that the UCC Allocation violated the absolute priority rule, including by providing for a $57,000,000 distribution to MIFSA Class 6(g) 4.75% Unsecured Notes via an illegal dividend to MIFSA from MP Ireland, while structurally senior unsecured creditors of MP Ireland would not be paid in full.

C.     **The Confirmation Opinion**

30.     The Bankruptcy Court's *Revised Opinion* [D.I. 6378] only mentions the UCC Waterfall in a footnote, noting that it had been prepared by the UCC "for purposes of settlement negotiations with the Debtors as well as for use as a reference in preparing the UCC Allocation." Revised Opinion, p. 68, n. 173. The *Revised Opinion* ignores that the UCC Waterfall forms the foundation of the UCC Allocation and Initial Fixed Distribution.

---

[9]     Importantly, only MIFSA and the Debtors' ultimate parent entity, Mallinckrodt plc, are liable to the Class 6(g) 4.75% Unsecured Notes Claim, and each entity is ascribed only *de minimis* value before including the net value of their subsidiaries.

[10]    Further to the inadequate assumption, Sanofi filed an amended proof of claim against MP Ireland in the amount of $189,000,000, as to which no party objected.

31. The Bankruptcy Court overruled Sanofi's objection that the UCC Allocation illegally dividends value to MIFSA in contravention of section 1129(b) of the Bankruptcy Code. The Bankruptcy Court erroneously determined that "Debtors' Waterfall scenarios show that [MP Ireland] is not providing any recovery to MIFSA." Revised Opinion, p.91. The Bankruptcy Court erred, however, because the UCC's waterfall does ascribe value to MIFSA's equity interest in MP Ireland; *Debtors'* waterfalls are irrelevant to the UCC Allocation.

32. With respect to unfair discrimination, the Bankruptcy Court noted "under all the [*Debtors'*] Waterfall Scenarios the dissenting classes here recover far more under the Plan than they are entitled to under the baseline and therefore no rebuttable presumption of unfair discrimination arises as to Class 6 when compared to the other classes." Revised Opinion, p.84. But the Bankruptcy Court ignored that "Class 6" actually consists of seven distinct subclasses, and further ignores that each subclass must be evaluated at each Debtor, because the Joint Plan does not provide for substantive consolidation. The consistent reliance on the Debtors' waterfall to justify the UCC Allocation and the disparate treatment among Class 6 subclasses ignores how the UCC Allocation and Joint Plan actually work.

33. The only other discussion of the UCC Allocation in the *Revised Opinion* relates to an unfair discrimination objection raised by another objector.[11] There, the Bankruptcy Court adopted the Debtors' after-the-fact nomenclature, referring to the Settlement Proceeds as "the Class 5 gift." Revised Opinion, p. 77. The Joint Plan says nothing about a gift, nor is Class 5 even mentioned in the Joint Plan's appendix discussing the UCC Allocation. This argument

---

[11] The Bankruptcy Court did not address Sanofi's arguments with respect to the UCC Allocation, other than in a footnote: "While Sanofi made the argument during the Confirmation Hearing that its claims should be compared with Class 6(g), that argument was not included in Sanofi's objections and therefore need not be considered." *Id.*, p. 77, n. 199. This is incorrect; Sanofi expressly addressed the impropriety of Class 6(g)'s distribution under the UCC Settlement and the Initial Fixed Distribution in its Supplemental Objection filed on November 1, 2021. [D.I. 5101].

was crafted after-the-fact by the UCC and the Debtors to try to avoid meritorious objections by Sanofi and others that the UCC Allocation violates the Bankruptcy Code, including the absolute priority rule and the prohibition against unfair discrimination.

34.     Notwithstanding that: (i) the UCC Settlement resolved the UCC's objection that too much value was being siphoned to achieve the Opioid Settlement; (ii) neither the Joint Plan nor the UCC Settlement refer to any "entitlement" of Class 5 creditors that they "gifted" away; (iii) Class 5 creditors are not parties to the UCC Settlement; and (iv) the UCC Objection and UCC Settlement had nothing to do with allocation of value to MIFSA or payment of MIFSA Class 6(g) Claims, the Bankruptcy Court agreed that the Settlement Proceeds were a "gift" from Class 5 and that, as such, they could be dramatically over-allocated to MIFSA's Class 6(g) creditors.

### D.  Sanofi Requested a Stay in the Bankruptcy Court

35.     On March 4, 2022, Sanofi filed a motion for a limited stay of certain severable implementing features of the Confirmation Order pending appeal [D.I. 6685].

36.     On March 24, 2022, the Bankruptcy Court held a hearing and issued an oral ruling denying Sanofi's motion for stay pending appeal.

### RELIEF REQUESTED

37.     Pursuant to Bankruptcy Rule 8007, Sanofi requests that this Court enter a limited stay, solely with respect to the disbursement of the Settlement Proceeds, so Sanofi's appeal may be decided without prejudice or any potential argument that a distribution may render this appeal equitably moot.  Sanofi does not challenge approval of the underlying UCC Settlement; Sanofi limits its appeal to what happens to the Settlement Proceeds and seeks a stay to prevent implementation of the Initial Fixed Distribution pending resolution of this appeal.

## BASIS FOR RELIEF REQUESTED

### A. Standard for Stay Pending Appeal

38. In determining whether to grant a stay pending appeal, courts within the Third Circuit consider: (1) whether the movant is likely to succeed on the merits[12]; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties; and (4) where the public interest lies. *See*, *e.g.*, *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015); *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). Each of these factors weighs in favor of the requested limited stay.

### B. Success on the Merits

39. Sanofi will likely succeed on the merits of its appeal, because the Bankruptcy Court incorrectly determined that the Settlement Proceeds constitute a "gift" from another class of unsecured creditors, which finds no support in the Joint Plan. The UCC Settlement reflects a compromise among the Debtors and the UCC that creates a single pot for all unsecured creditors in all Class 6 subclasses. There is simply no way to reconcile the UCC's and the Debtors' "gift" argument, or the Bankruptcy Court's adoption of that argument, with the plain language of the Joint Plan. The Settlement Proceeds should be distributed on a *pro rata* basis pursuant to the absolute priority rule. The UCC Allocation and the Initial Fixed Distribution violate the absolute priority rule, by allocating value to MIFSA on account of its equity interest in MP Ireland, then distributing that value to MIFSA's Class 6(g) creditors, but without ensuring that MP Ireland's structurally superior creditors are paid in full.

---

[12] The probability of success must be "significantly better than negligible," but does not need to be "more likely than not" or "greater than 50%." *Revel*, 802 F.3d at 570.

40. The Bankruptcy Court's consideration of the Settlement Proceeds as a gift erroneously construes the Joint Plan and the evidence, which make clear that the Settlement Proceeds were not a gift. The UCC Settlement is a settlement among the Debtors and the UCC only. The purported "gifting" creditors are not party to the UCC Settlement and did not make a gift of their property. Nor did they participate in creating the UCC Allocation or otherwise involve themselves with how the Settlement Proceeds should be allocated. Even if the Settlement Proceeds could be construed as a gift from Class 5 unsecured creditors (which it is not), they had nothing to do with how the Settlement Proceeds are then disproportionately allocated among the several Class 6 subclasses of the several Debtors.

41. Sanofi will likely prevail on its appeal, because there is no basis for one unsecured creditor to make a "gift" of its anticipated reorganization securities under a plan. The only case cited in the Revised Opinion to support this "gifting" theory is *In re Nuverra Environmental Solutions, Inc.*, 590 B.R. 75 (D. Del. 2018), which involved a gift from the collateral of a secured creditor to general unsecured creditors, which is entirely distinct from the "entitlement" of a future right and gift theory suggested here. *Nuverra*, at 79.

42. The Debtors' evidence of "entitlements" for all unsecured creditors was based on *estimates* of allowed Class 6 claims at various Debtors. This renders such conclusions entirely unreliable, as the actual entitled recoveries for unsecured creditors are dependent on the ultimate reconciliation of asserted Class 6 claims, especially against MP Ireland, and especially as no estimation of claims was performed under section 502(c) or Rule 3018.

43. It was reversible error for the Bankruptcy Court to hold that the Settlement Proceeds were a "gift" or that the UCC Allocation of the Settlement Proceeds need not comply with the absolute priority rule. The Debtors' evidence was inherently unreliable, because actual

entitlements cannot be determined until claims are reconciled or estimated, which did not occur here.[13]

44. Even if some portion of the Settlement Proceeds could be deemed a gift from another class of unsecured creditors, the Settlement Proceeds should still be distributed pursuant to the requirements of section 1129(b), including the absolute priority rule. Settlement Proceeds should not be allocated to MIFSA Class 6(g) on account of MIFSA's equity interest in MP Ireland before MP Ireland's creditors are paid in full. The Third Circuit has made clear that even if gifting were permissible, the case law does "not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive. Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B)." *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 514 (3d Cir. 2005). Here, approval of the UCC Allocation violates these principles because Class 6(g) creditors receive a recovery from MIFSA, and value is only ascribed to MIFSA on account of its equity interest in MP Ireland.

45. Sanofi will also likely prevail on the merits of its appeal because the Bankruptcy Court improperly failed to consider Sanofi's objections. Sanofi objected that the UCC Allocation of the Settlement Proceeds, including the Initial Fixed Distribution, was improper. *See* Supplemental Objection [D.I. 5101]. Sanofi introduced evidence in support of this objection, both through cross-examination of the Debtors' and the UCC's witnesses, and through direct-examination testimony of Sanofi's witness, Mr. Madden. *See* Hearing Transcripts of December 10, 14 and 15, 2021, attached hereto.

---

[13] Moreover, once the value of MP Ireland is corrected to include the value of the Acthar Gel intellectual property, the "entitlement" for MP Ireland Class 6 creditors will further dramatically increase.

46. The Bankruptcy Court failed to address Sanofi's objections or evidence, based on the erroneous conclusion that Sanofi did not properly raise each of these issues in its filed objections. *See*, *e.g.*, Revised Opinion, pp. 57-58, n.142 (stating that arguments made for the first time during closing arguments would not be considered); and p. 69, n. 178 (same). In both footnotes, the Bankruptcy Court cites to *MZM Const. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 406 n.13 (3d Cir. 2020) and *L-3 Commc'ns Corp. v. Sony Corp.*, 2014 WL 4674815, at *3 (D. Del. Sept. 12, 2014), neither of which relates to positions taken *at trial*. *MZM* addresses a party raising an argument for the first time, *on appeal*, before the Third Circuit. *MZM*, at 406 n.13 ("MZM raised this issue for the first time at oral argument **before this Court** – too late for us to consider it. That argument is thus forfeited.") (emphasis added). Similarly, *L-3* deals with *post-trial* motions. *L-3*, at *3 ("During oral argument, L-3 raised a new argument. . . . L-3 did not raise this issue in its opening statement nor argue it in its closing argument."). These cases are inapplicable, as Sanofi conformed its closing argument *at trial, before the trial court*, to the evidence adduced during the trial. Sanofi is unaware of any authority that a litigant at trial is confined to the precise language of an objection filed months before the discovery cutoff or hearing.

**C.  Irreparable Harm**

47. Without a stay, Sanofi will be irreparably harmed because so much of the Settlement Proceeds will be distributed on the Effective Date, leaving Sanofi without an adequate remedy to receive a pro rata distribution if this appeal is resolved in Sanofi's favor.

48. If Sanofi prevails on this appeal, then the appropriate treatment of Class 6 claimants, especially at MP Ireland, will be dramatically different than reflected in the Initial Fixed Distribution, because those distributions were calculated using inaccurate estimates of

allowed claims. Further, the Initial Fixed Distribution incorporated an allocation unsupported by the record and without regard for ultimate *pro rata* recoveries. Making appropriate distributions, however, will likely be impossible if nearly all of the cash Settlement Proceeds are distributed on the Effective Date. If the absolute priority rule is enforced, then the appropriate recovery to Class 6(g) claimants, which only hold claims against entities with *de minimis* value, will be significantly less than the $57,000,000 that the UCC's committee members decided to distribute to those claimants on the Effective Date. Sanofi will be irreparably harmed if the distribution occurs before the appeal can be decided.

### D. No Harm to Other Parties

49. Also clear is the lack of harm to others if a stay is granted. The stay will not delay the occurrence of the Effective Date or the Debtors' reorganization, or even impact the material terms of the UCC Settlement (i.e., the extent of Settlement Proceeds for Class 6 claimants).

50. The Debtors and other significant non-Class 6 creditors and other parties-in-interest have no interest in how the Settlement Proceeds are divided among the various Class 6 subclasses. If the Debtors ultimately prevail in their "gift" argument – i.e., if some of the Settlement Proceeds are determined to be a gift *and* those proceeds need not be distributed pursuant to the absolute priority rule, then no other Class 6 creditor could be harmed by a stay, as the only impact would be *when* they receive their "gift." There is no bargained-for exchange in the context of a gift. If it is a gift, the recipients are not harmed by a delay because they have no property interest or entitlement in the first place.

51. The stay is important to Sanofi; nevertheless, due to its limited scope, it will not adversely impact any other party. The requested stay merely preserves the *status quo* to permit

meaningful appellate review.

### E. Public Interest

52. Consideration of the public interest also weighs in favor of granting the requested limited stay pending appeal.

53. The public interest is supported by requiring that distributions under a bankruptcy plan comply with the requirements of the Bankruptcy Code, including the absolute priority rule. The Bankruptcy Court's determination that principles of "gifting" justify a deviation from what the Bankruptcy Code otherwise requires finds no support in any case law. Certainly, there is no "gifting" exception in the Bankruptcy Code, and the Bankruptcy Court's approval of a gift in this context (i.e., from one unsecured creditor of debtor's property to another) goes even further than prior case law cited by the Bankruptcy Court in its Revised Opinion. *See*, *e.g.*, *Nuverra*, *supra* (permitting gifting by secured creditors).

54. Here, the Bankruptcy Court (1) extended the gifting doctrine from the typical "secured creditor collateral to unsecured creditor" context, to "unsecured creditor to other unsecured creditor" of estimated speculative recoveries under several non-consolidated, non-pot plans, (2) approved fixed-dollar distributions before claims are determined and reconciled, and (3) misconstrued case law to avoid even considering Sanofi's objections. Under these circumstances the public interest supports meaningful appellate review, as opposed to the anticipated unfair application of the equitable mootness doctrine if a stay is not entered. *See*, *e.g.*, *In re Semcrude, L.P.*, 728 F.3d 314, 318 (3d Cir. 2013) (discussing judge-made origin of equitable mootness doctrine and responsibility of federal courts to exercise their appellate jurisdiction in support of limiting use of equitable mootness).

### F. No Bond Should be Required

55.     Bankruptcy Rule 8007(c) provides that the "district court, BAP, or court of appeals may condition relief on filing a bond or other security with the bankruptcy court." Fed. R. Bankr. P. 8007(c).  No such bond should be required in this case.

56.     The purpose of a bond is to offset some risk that may befall the prevailing party from the trial court as a result of a stay pending appeal.  *See*, *e.g.*, *In re Tribune Media Co.*, 973 F.3d 272, 281 (3d Cir. 2015) ("The purpose of requiring such a 'bond . . . is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court.")

57.     Here, the Debtors are the prevailing party. The Debtors, however, once they deliver the Settlement Proceeds to the GUC Trustee have no further interest in the allocation of the Settlement Proceeds and will suffer no harm by a delay in distribution.  Moreover, as noted by the Third Circuit, the purpose of a bond is similar to "where the judgment is sufficiently comparable to a money judgment so that payment on a supersedeas bond would provide a satisfactory alternative to the appellee." *Id*. at 281-82.

58.     Here, such concerns are inapplicable.  The Debtors will deliver the Settlement Proceeds on the Effective Date to the GUC Trustee, which Sanofi does not ask to stay. Sanofi only requests that the Court prevent the GUC Trustee from disbursing the Settlement Proceeds, especially the Initial Fixed Distribution.  This presents no risk of diminution or disappearance of assets. The GUC Trustee is tasked to safeguard the assets of the GUC Trust.  No bond should be required.

59.     Pursuant to Bankruptcy Rule 8015(h), this Motion contains 5,180 words, excluding parts of the document exempted by Bankruptcy Rule 8015(g).

**WHEREFORE,** Sanofi respectfully requests that the Court grant the requested limited stay pending appeal.

Dated: April 4, 2022                              **DLA PIPER LLP (US)**

                                                        */s/ Stuart M. Brown*
                                                Stuart M. Brown (DE #4050)
                                                Aaron S. Applebaum (DE #5587)
                                                1201 North Market Street, Suite 2100
                                                Wilmington, Delaware 19801
                                                Telephone:    (302) 468-5700
                                                Facsimile:    (302) 394-2341
                                                Email: stuart.brown@us.dlapiper.com
                                                                            aaron.applebaum@us.dlapiper.com

                                                - and -

                                                Jason Hopkins (TX 24059969)
                                                1900 North Pearl Street
                                                Suite 2200
                                                Dallas, Texas 75201-2482
                                                Telephone:    (214) 743-4546
                                                Email: jason.hopkins@us.dlapiper.com

                                                *Attorneys for sanofi-aventis U.S. LLC*