# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re:                                   :        Chapter 11
                                         :
MALLINCKRODT PLC, et al                  :        Case No. 20-12522 (JTD)
                                         :        (Bankr. D. Del.)
                  Debtors.¹              :        (Jointly Administered)
-------------------------------------------------:
SANOFI-AVENTIS U.S. LLC,                  x
                                         :
                  Appellant,             :
v.                                       :
                                         :        C.A. No. 1:22-cv-00216 (TLA)
MALLINCKRODT PLC, et al.,                 :
                                         :        Bankruptcy BAP No. 22-09
                  Appellees.             :
-------------------------------------------------x
```

## <u>APPELLANT'S OPENING BRIEF</u>

Stuart M. Brown (DE #4050)
R. Craig Martin (DE #5032)
Aaron S. Applebaum (DE #5587)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail: stuart.brown@us.dlapiper.com
       aaron.applebaum@us.dlapiper.com

Ilana H. Eisenstein (*pro hac vice*)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia PA 191903-7300
Telephone: (215) 656-3300
Email: ilana.eisenstein@us.dlapiper.com

Dated: May 9, 2022

*Counsel to Appellant sanofi-aventis U.S. LLC*

---

[1]    A complete list of the Debtors in the above-captioned chapter 11 cases is set forth on "Annex 1" to the disclosure statement approved by the Bankruptcy Court (defined herein). *See Appendix in Support of Appellant's Opening Brief* ("**AA**") AA3809-3810.

## **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

INTRODUCTION AND PRELIMINARY STATEMENT ......................................1

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION.....................6

STATEMENT OF THE ISSUES.....................................................................7

STANDARD OF REVIEW ............................................................................10

STATEMENT OF THE CASE........................................................................11

      A.     Sanofi's Claims and Pre-Confirmation Procedural History...............11

      B.     Evolution of the Joint Plan and the UCC Settlement.........................12

      C.     The UCC Allocation.......................................................................16

      D.     Sanofi's Objection to Confirmation ...................................................21

      E.     The Bankruptcy Court's Confirmation Ruling ..................................21

I.     SUMMARY OF THE ARGUMENT ...........................................................24

II.    ARGUMENT........................................................................................26

      A.     The Bankruptcy Court Committed Legal Error by Confirming the Joint Plan, Because the UCC Allocation Violates the Absolute Priority Rule ...................................................26

            1.     The UCC Allocation Violates the Absolute Priority Rule ......................................................................................27

            2.     Alternatively, the Bankruptcy Court Erred by Creating an Unlawful "Gift" Exception to the Absolute Priority Rule .............................................................29

B.   The Bankruptcy Court Erred in Confirming the Joint Plan
     Because the UCC Allocation Unfairly Discriminates
     Against Sanofi ........................................................................32

C.   The Bankruptcy Court Erred by Holding that Sanofi's
     Amended Claim is Invalid.....................................................37

III.  CONCLUSION...............................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Anes*,
    195 F.3d 177 (3d Cir. 1999) ...............................................................10

*In re Armstrong*,
    432 F.3d 507 (3d Cir. 2005) ......................................................*passim*

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)...........................................................................26

*In re BDSD North America, Inc.*,
    634 F.3d 79 (2d Cir. 2011) ................................................................32

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017)..........................................................................28

*Matter of D&F Construction Inc.*,
    865 F.2d 673 (5th Cir. 1989) .............................................................36

*In re Linkous*,
    141 B.R. 890 (D. W.D. Va. 1992) .....................................................38

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988)......................................................................26, 29

*In re Tribune Company*,
    972 F.3d 228 (3d Cir. 2020) .............................................33, 34, 35, 36

*U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*,
    138 S.Ct. 960 (2018)..........................................................................10

## Statutes

11 U.S.C. § 501 ...................................................................................... 37

11 U.S.C. § 502(a) ...................................................................................5

11 U.S.C. § 501(a) ...................................................................................8

11 U.S.C. § 502(b) ................................................................................................37

11 U.S.C. §1129(b)(2)(B) ..........................................................................7, 24, 26, 28

11 U.S.C. § 1129(b)(2)(B)(ii) ..............................................................................31

28 U.S.C. § 158(a)(1)..........................................................................................6

## **Other Authorities**

Fed. R. Bankr. P. 3018 .........................................................................................38

Fed. R. Bankr. P. 3007 .........................................................................................37

## <u>INTRODUCTION AND PRELIMINARY STATEMENT</u>[2]

The Bankruptcy Court erroneously confirmed the Joint Plan in the above-captioned cases even though it improperly distributes $57,000,000 in value that should be distributed to creditors of Debtor Mallinckrodt Pharmaceuticals Ireland Limited ("**MP Ireland**") and instead provides that such value will be distributed under the Joint Plan to certain unsecured creditors of MP Ireland's parent company, Mallinckrodt International Finance SA ("**MIFSA**") in a manner that violates the absolute priority rule and discriminates unfairly against holders of claims in MP Ireland Class 6(f).  MIFSA's unsecured creditors, classified in Class 6(g) of the Joint Plan, are structurally subordinate to MP Ireland's unsecured creditors in Class 6(f), who under the absolute priority rule are entitled to be paid in full before excess value attributable to MP Ireland can be distributed up to MIFSA for payment to its creditors.

Because Class 6(f) of the MP Ireland Plan[3] voted to reject the Joint Plan, the Class was protected from that distribution proposal by the "absolute priority rule" and unfair discrimination provisions of the "cram down" section of the Bankruptcy

---

[2]     Capitalized terms used but not otherwise defined in this *Introduction and Preliminary Statement* have the meanings ascribed to them elsewhere in this Opening Brief.

[3]     The Joint Plan does not provide for the substantive consolidation of any of the Debtors and is a separate plan for each Debtor.

Code,[4] meaning that creditors holding claims in the rejecting MP Ireland Class 6(f) should be paid or provided for in full from all value attributed to MP Ireland prior to any value being redistributed to creditors of MIFSA in Class 6(g). Sanofi voted to reject the Joint Plan, is a member of the rejecting MP Ireland Class 6(f), and filed this appeal to assert its rights under the cram down provisions of the Bankruptcy Code.

The Debtors and the Official Committee of Unsecured Creditors of the Debtors ("**UCC**") negotiated for a pot of the Debtors' assets to be distributed under the Joint Plan to the Debtors' general unsecured creditors classified in the various subclasses of Class 6. The UCC reserved the right to and did allocate the value of those Settlement Proceeds among all the Debtors, and then further allocated each Debtor's share of the Settlement Proceeds to the various classes of unsecured creditors in the Class 6 subclasses, which included an allocation to MIFSA on account of its equity interest in MP Ireland and then to MIFSA's creditors, based on the outdated and unreasonable assumption that the extent of Class 6 unsecured claims against MP Ireland was only $14,000,000.

---

[4]      The term "cram down" is a term of art given to the construct created by section 1129(b) of Title 11 of the United States Code ("**Bankruptcy Code**"). *See*, *e.g.*, Kenneth N. Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 AM.BANK.L.J. 133, 136 (1979).

The UCC's allocation did not adhere to the dictates of the absolute priority rule; rather, approximately $57,000,000 that should be paid to MP Ireland's Class 6(f) creditors is instead allocated to creditors of MIFSA, MP Ireland's parent, in furtherance of an allocation that generally provided disproportionate treatment to certain Class 6 subclasses and violates the absolute priority rule.  The Debtors knew the UCC Allocation did not comport with the Bankruptcy Code and built into the Joint Plan a savings clause contemplating that the Joint Plan could be confirmed with a judicial modification of the UCC Allocation to bring it into compliance with the requirements of the Bankruptcy Code, including the absolute priority rule.[5]

The Bankruptcy Court, despite binding Third Circuit precedent, rationalized the violation of the absolute priority rule on the erroneous legal conclusion that the Debtors' property being distributed under the Joint Plan should be deemed a "gift" from one class of unsecured creditors, those in Class 5, to another class of general unsecured creditors, skipping the necessary distributions to structurally senior Class 6(f) creditors of MP Ireland under application of the absolute priority rule.  In reaching this legal conclusion, the Bankruptcy Court failed to follow binding Third

---

[5]     Appellant is not aware of any similar clause in a chapter 11 plan, recognizing that a proposed distribution may violate the requirements of the Bankruptcy Code and expressly contemplating further adjustment by the Bankruptcy Court.  Such an extraordinary provision signals the Debtors' apparent discomfort with the UCC Allocation and the need for a safety valve to ensure that it did not jeopardize the rest of the Joint Plan.

3

Circuit precedent, holding that gifts must be distributed in compliance with the absolute priority rule.[6]  The plain language of the Debtors' Joint Plan provided that the UCC Allocation would follow the absolute priority rule; the Joint Plan had an express saving clause, providing that if the UCC Allocation did not satisfy the absolute priority rule the distributions under the Joint Plan would be adjusted to ensure compliance.  When the time came, however, and Sanofi objected that the absolute priority rule had been violated, the Debtors changed tact and made their gifting argument as an apparent rationale why the absolute priority rule should not control.  The Bankruptcy Court agreed erroneously.

The Bankruptcy Court also committed legal error by approving a plan that unfairly discriminated against Sanofi and the other holders of claims in rejecting MP Ireland Class 6(f).  The UCC Allocation approved by the Joint Plan deviates from *pro rata* entitlements to provide substantial windfalls to certain subclasses within Class 6, most notably Class 6(c) and Class 6(g), in a way that discriminated against Class 6(f) where Sanofi's claim sits.  Once the UCC Allocation is corrected to comply with the absolute priority rule, as expressly provided for under the Joint Plan, each Class 6 subclass at each Debtor should receive (or a reserve be established for) a *pro rata* distribution from the initial cash component of the Settlement Proceeds.

---

[6]     *See Armstrong*, *infra* (expressly providing that whether a gift or not, debtor's property must be distributed under a plan according to the requirements of the absolute priority rule).

Giving certain subclasses a disproportionately high and guaranteed cash recovery initially, with the hope that sufficient proceeds will be recovered from intangible assets to "true-up" the distributions unfairly allocates risk to the dissenting subclasses.

Finally, the Bankruptcy Court's Revised Opinion erroneously states that an Amended Claim Sanofi filed against MP Ireland is "invalid," even though no objection was filed (either in the Joint Plan or otherwise) against such proof of claim. It is hornbook law that Sanofi's filed proof of claim is *prima facie* valid if no objection is made to the claim and yet the Bankruptcy Court did not afford that claim this treatment.[7]

Sanofi respectfully requests that this Court reverse the Bankruptcy Court's confirmation of the Joint Plan, because the Bankruptcy Court's approval and confirmation of the UCC Allocation, Initial Fixed Distribution and Joint Plan violates the absolute priority rule and unfairly discriminates against MP Ireland's dissenting impaired Class 6(f). Sanofi further requests that the Court reverse the Bankruptcy Court's statement that Sanofi's Amended Claim is invalid, because it is deemed a *prima facie* valid claim until an objection to it is filed and determined.

---

[7]     11 U.S.C. § 502(a).

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The United States Bankruptcy Court for the District of Delaware ("**Bankruptcy Court**") issued an *Opinion*[8] and a *Revised Opinion*[9] ("**Revised Opinion**"), explaining its decision to confirm the *Debtors' Fourth Amended Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* ("**Joint Plan**"). The Bankruptcy Court entered its *Findings of Fact, Conclusions of law, and Order Confirming Fourth Amended Joint Plan of Reorganization (with technical modifications) of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*[10] ("**Confirmation Order**") on March 2, 2022.[11] sanofi-aventis U.S. LLC ("**Sanofi**") timely appealed confirmation of the Joint Plan on February 17, 2022.[12] This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1).

---

[8] Opinion, AA1-103; D.I. 6347 (References to "D.I." herein refer to documents indexed on the docket in the Debtors' jointly administered bankruptcy cases).

[9] Revised Opinion, AA104-206; D.I. 6378.

[10] Confirmation Order, AA207-633; D.I. 6660. The Joint Plan is attached as an exhibit to the Confirmation Order.

[11] The Confirmation Order and the Revised Opinion together confirm the Joint Plan. To the extent of any conflict between the Confirmation Order and Revised Opinion, the terms of the Revised Opinion control. Confirmation Order, ¶¶2-3, AA219-220.

[12] *See* AA634-846; D.I. 6489. Sanofi subsequently filed an amended notice of appeal on March 4, 2022, following entry of the Confirmation Order. *See* AA847-1488; D.I. 6674.

## STATEMENT OF THE ISSUES

1.     The Bankruptcy Code provides that, if an impaired class of claims under a plan does not accept that plan, then the plan may be approved only if the plan "does not discriminate unfairly" and is "fair and equitable" as to that rejecting, impaired class.[13] "Fair and equitable" is statutorily defined for a class of unsecured claims to mean the class either receives property equal to the full amount of the creditors' claims or that no holder of a claim or interest junior to them will receive or retain property under the plan.[14] Class 6(f) of MP Ireland voted to reject the Joint Plan,[15] and Sanofi objected to confirmation because, among other reasons, the Joint Plan allocates value that should have been paid to or reserved for creditors in Sanofi's rejecting MP Ireland Class 6(f) and instead pays it to creditors of MIFSA, a structurally junior Debtor, on account of MIFSA's equity interest in MP Ireland that should not retain or receive any value based on the absolute priority rule and fails to reserve value for the full payment of the claims in MP Ireland Class 6(f). The Debtors, to their credit, recognized that the UCC Allocation incorporated in the Joint Plan did not comport with the absolute priority rule, stated that the absolute priority would be honored, and expressly contemplated the Bankruptcy Court making an

---

[13]     11 U.S.C. § 1129(b).

[14]     11 U.S.C. §1129(b)(2)(B).

[15]     Revised Opinion, AA111; D.I. 6378.

7

adjustment to the distribution if required to ensure compliance with the absolute priority rule.  Nevertheless, that adjustment never occurred, as the distribution to a structurally junior claimant was justified by articulating a "gifting" exception to the absolute priority rule.  The Bankruptcy Court held that the creditors could agree among themselves to violate the absolute priority rule and that doing so did not unfairly discriminate against the harmed rejecting class. Thus, the question presented is whether the protections of the absolute priority rule and prohibition of unfair discrimination afforded under section 1129(b) of the Bankruptcy Code to holders in MP Ireland Class 6(f) can be avoided by application of an alleged gift of Debtors' property from one set of unsecured creditors to another?

2.     The Bankruptcy Code provides that a creditor may file a proof of claim.[16] When a proof of claim is filed, that claim is *prima facie* valid and presumed to be an allowable claim.  That presumption may only be rebutted by a filed and noticed objection and when it is, the creditor is then afforded a chance to prove the validity of its proof of claim at an evidentiary hearing.  Here, Sanofi timely filed a proof of claim and then filed an amended proof of claim.  No objection has been filed by any party to either claim.  The Bankruptcy Court nonetheless ruled that Sanofi's filed amended proof of claim was "invalid."   Therefore, the question

---

[16]     11 U.S.C. § 501(a).

presented is whether the Bankruptcy Court erred in its determination that Sanofi's

amended proof of claim is invalid when no one objected to it?

## <u>STANDARD OF REVIEW</u>

Exercising its appellate jurisdiction, this Court reviews the Bankruptcy Court's conclusions of law *de novo* and its findings of fact for clear error.[17]  For mixed questions of law and fact requiring the Bankruptcy Court to develop auxiliary principles of use in other cases, this Court should review on a *de novo* basis, whereas mixed questions requiring immersion in case-specific factual issues should be reviewed for clear error.[18]  "Whether a reorganization plan violates the absolute priority rule is a question of law."[19]

---

[17]     *See In re Anes*, 195 F.3d 177, 180 (3d Cir. 1999) ("In core matters, the District Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo.").

[18]     *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 138 S.Ct. 960, 967 (2018).

[19]     *In re Armstrong*, 432 F.3d 507, 511 (3d Cir. 2005).

## STATEMENT OF THE CASE

### A. Sanofi's Claims and Pre-Confirmation Procedural History

The Debtors filed voluntary petitions for relief under the Bankruptcy Code on October 12, 2020 ("**Petition Date**").  On February 16, 2021, Sanofi timely filed a $7,579,306.87 proof of claim against MP Ireland on account of royalty obligations owed to Sanofi arising from sales of Acthar Gel occurring prior to the Petition Date.[20]

On August 6, 2021, nearly six months after the deadline for filing proofs of claim, the Debtors filed Exhibit U to their "Plan Supplement" (as subsequently amended, "**Rejection Notice**"), which listed contracts and leases to be rejected under the Joint Plan.[21]  The Rejection Notice purported to include a 2001 asset purchase agreement ("**APA**") with Sanofi under which MP Ireland, and other Debtors, owed Sanofi royalties for sales of Acthar Gel.

On October 12, 2021, Sanofi objected to the rejection of the APA, asserting it was not an executory contract and that the Acthar Gel royalty obligations would continue post-confirmation or that if the APA was rejected, the Debtors could no longer sell Acthar Gel.[22]  On November 4, 2021, after the confirmation hearing had commenced and related discovery was ongoing, the Bankruptcy Court ruled that the

---

[20]     *See* AA1489-1497; Proof of Claim No. 6113.

[21]     *See* AA1498-1525; D.I. 3596.

[22]     *See* AA1526-1569; D.I. 4675.

APA was not executory and, therefore, could not be rejected and that all existing and future obligations under the APA would be treated as pre-Petition Date claims that could be discharged under a confirmed plan.[23]  The Bankruptcy Court issued an order memorializing its ruling on November 8, 2021 ("**APA Order**").[24]

After the Bankruptcy Court entered the APA Order, Sanofi filed an amended proof of claim against MP Ireland in the liquidated amount of $189,982,923.00 ("**Amended Claim**").[25] The Amended Claim asserts a claim for pre-Petition Date amounts due and for amounts that will come due in January 2022 and each year thereafter, arising from the Debtors' future sales of Acthar Gel.  No objection has been filed to the Amended Claim.

### B. Evolution of the Joint Plan and the UCC Settlement

On May 18, 2021, the UCC objected to the Debtors' disclosure statement,[26] alleging that the Debtors' proposed settlements of their opioid liabilities impermissibly siphoned value from other Debtors not burdened with opioid

---

[23]    *See* Hearing Transcript, November 4, 2021, AA1573 (line 22) – 1583 (line 2); D.I. 5186.

[24]    *See* AA1584-1585; D.I. 5210.  Sanofi appealed the APA Order to this Court, which appeal has been briefed and remains pending. *See sanofi-aventis U.S. LLC v. Mallinckrodt plc, et al.*, Case No. 1:21-cv-01636(TLA) (D. Del.).

[25]    *See* AA1586-1600; Proof of Claim No. 52141.  At the same time, Sanofi filed proofs of claim for the same amount against other Debtors, to which the Debtors filed objections.  [D.I. 5682.]

[26]    *See* AA1748-1784; D.I. 2392.

liabilities. The UCC further objected that the "Plan proposes to ignore that each Debtor must be valued independently, and instead unfairly shifts value away from General Unsecured Creditors and into the pockets of [Class 5] Guaranteed Unsecured Noteholders . . . and the opioid claimants."[27]

On June 18, 2021, after the Bankruptcy Court approved the Debtors' disclosure statement, reserving for confirmation the unresolved objections of the UCC, the Debtors filed the solicitation version of their plan ("**Solicited Plan**").[28] The Solicited Plan constituted a separate chapter 11 plan of reorganization for each Debtor and classified claims and interests by each Debtor.[29]

The Solicited Plan provided that Class 5 claimants (known as Guaranteed Unsecured Notes Claim holders) would receive the equity of the Reorganized Debtors,[30] and each creditor in each subclass within Class 6 would receive a "General Unsecured Claims Distribution," generally defined as a *pro rata* share of $100,000,000.[31] Holders of the "4.75% Unsecured Notes" were classified as part of Class 6(d) and were to receive as little as a 0.8% distribution under the Solicited

---

[27]    *Id.*, ¶5; AA1750-1752.

[28]    *See* AA1601-1747; D.I. 2916.

[29]    *Id.*, AA1605.

[30]    *Id.*, AA1657.

[31]    *Id.*, AA1619-1620; 1656-1658.

Plan.[32]

During the summer of 2021, after the claims bar date but before the Rejection Notice was filed or disclosed to the UCC, the Debtors, UCC and other parties (not including Sanofi or any other creditor in MP Ireland Class 6(f)) participated in a mediation, leading to several settlements, including, as pertinent to this appeal, a settlement among the Debtors and the UCC ("**UCC Settlement**").[33]  Through the UCC Settlement, the Debtors agreed to increase the aggregate recovery for Class 6 general unsecured claimants from $100,000,000 under the Solicited Plan, to $135,000,000 in cash plus certain intangible assets and the proceeds thereof (collectively, "**Settlement Proceeds**") under the Joint Plan.

While the amount of the aggregate distribution available for all of the Class 6 subclasses increased under the UCC Settlement and the Joint Plan, the UCC Settlement eliminated the concept that Class 6 unsecured creditors would receive a *pro rata* recovery.  Instead, the UCC Settlement reserved for the UCC and its committee members the right to dictate, without input from other affected creditors, a fixed allocation and disbursement of the Settlement Proceeds, not only as among the several Debtors, but with respect to each Debtor and each Class 6 subclass of

---

[32]    *Id*., AA1606, 1623, 1657; *see also*, Testimony of Mark Greenberg, Hearing Transcript, Dec. 13, 2021, AA2327 (lines 23-25) and AA2328 (line1).

[33]    *See* AA1795-1809; D.I. 4121.

unsecured claims against each such Debtor, all subject to the express caveat in the Joint Plan that the allocation would remain subject to adjustment by the Bankruptcy Court to ensure that the distribution complied with the requirements of the Bankruptcy Code.  Specifically, the prefatory language in the Joint Plan with respect to the treatment of all Class 6 subclasses provides that "[e]ach Holder of an Allowed Claim in Class 6(a)-(g) shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, the recoveries set forth in Class 6(a)-(g) below, subject to adjustment to the [UCC] allocation of [the Settlement Proceeds] solely to ensure that the recoveries of each Class 6 subclass satisfies the requirements of the Bankruptcy Code."[34]

After achieving its settlement with the Debtors, the UCC independently devised its allocation ("**UCC Allocation**"), including a fixed distribution to occur on the Effective Date of the Joint Plan ("**Initial Fixed Distribution**").  The record reflects that the UCC's professionals then set up separate 1-hour zoom meetings with each of the individual members of the UCC to explain the allocation and to allow for enough time for them to ask any questions that they might have with regards to the allocation's development.[35]

---

[34]     Confirmation Order, AA473; D.I. 6660.

[35]     *See* Testimony of Mark Greenberg, Hearing Transcript, Dec. 13, 2021, AA2344 (lines 7-19). The record also reflects that the Acthar claimant on the UCC initially voted not to approve the UCC Settlement, "because she had concerns that the Acthar claimants as part of the proposed allocation were not being provided with

On September 29, 2021, the Debtors filed a "First Amended" plan,[36] under which the Class 5 Guaranteed Unsecured Noteholders would still receive the equity of the Reorganized Debtors, but materially changing the treatment for the Class 6 subclasses and incorporating the UCC Allocation and the Initial Fixed Distribution into the Joint Plan.  Further, the Debtors materially changed the composition of the Class 6 subclasses, with holders of the 4.75% Unsecured Notes, who were previously classified in MIFSA and Mallinckrodt plc Class 6(d) and who would have received only a *de minimis* distribution under the Solicited Plan, now classified in MIFSA and Mallinckrodt plc Class 6(g) and guaranteed far more favorable treatment through operation of the UCC Allocation and the Initial Fixed Distribution.[37]

### C. The UCC Allocation

The UCC Allocation is set forth on the "UCC Appendix," attached as Exhibit

---

a guaranteed minimum recovery." *See* Testimony of Mark Greenberg, Hearing Transcript, Dec. 13, 2021, AA2348 (lines 5-25) and AA2349 (lines 1-4). For clarity, "Acthar Claimants," classified in Class 6(a) of the Joint Plan, are parties with asserted litigation claims against the Debtors related to Acthar Gel.  Sanofi's claims, on the other hand, classified in Class 6(f) of the Joint Plan, comprise contractual royalties arising from the Debtors' sale of Acthar Gel.  Sanofi is not an "Acthar Claimant" under the Joint Plan.

[36]     *See* AA1827-2013; D.I. 4508.   The Debtors filed further amendments, culminating in the "Joint Plan" that was confirmed by the Bankruptcy Court.  The Joint Plan and the "First Amended" Plan are substantively identical with respect to UCC Settlement and issues in this appeal, and are referred to generally as the "Joint Plan."

[37]     *Id*., AA1833, 1891.

6 to the Joint Plan,[38] which describes the UCC Allocation as "the product of a multi-step calculation process" consisting of the "UCC Waterfall," "Allocation Step 1" and "Allocation Step 2."[39]

The UCC Waterfall, the first step underlying the rest of the UCC Allocation, assumes a total value of $7,200,000,000 for all of the Debtors and allocates that value among each Debtor.[40]  The UCC Waterfall allocates 57% of the Debtors' total value to MP Ireland and only *de minimis* value to either MIFSA or Mallinckrodt plc, the only two Debtors obligated to pay the 4.75% Unsecured Notes in Class 6(g).[41]

The UCC Waterfall was also constructed based on assumptions about the amount of unsecured claims against each Debtor, including an assumption that the amount of allowed Class 6 general unsecured claims at MP Ireland would be $14,000,000 in the aggregate – all of which are in Class 6(f).[42]  Because the assumed Class 6(f) MP Ireland claims pool was substantially lower than the value allocated

---

[38]    Confirmation Order, AA590-598; D.I. 6660.

[39]    *Id*. at AA591-592.

[40]    *Id*.; *see also* Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2422 (lines 8-21).

[41]    *See* Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2448 (line 15) – AA2449 (line 21); *see also* Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2518 (lines 3-9).

[42]    *See* Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2452 (lines 5-25); *see also* Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2516 (line 12) – AA2517 (line 13).

to MP Ireland in the UCC Waterfall, the UCC Waterfall re-allocated the surplus value to MIFSA, MP Ireland's parent entity.[43]  These assumptions were developed in the Summer of 2021, before the Rejection Notice and Amended Claim were filed and were never updated, even after substantial, previously unanticipated claims, such as Sanofi's Amended Claim, were asserted against MP Ireland.

As a result of these and other assumptions, the UCC Waterfall permits substantial value initially allocated to MP Ireland to be distributed to Class 6(g) claimants by way of an equity distribution to MIFSA – one of the two Debtors liable for the Class 6(g) claims.[44]  Expressed otherwise, the UCC Waterfall suggests that MP Ireland is solvent, based on its primary assumptions that MP Ireland will be allocated 57% of $7,200,000,000 (or $4,138,200,000) of total value and that it must satisfy only $14,000,000 of unsecured claims in Class 6 in the aggregate.  Therefore, based on this unreasonable assumption, the UCC Waterfall ascribes substantial value to MIFSA's equity interest in MP Ireland and the UCC Allocation guarantees a distribution to MIFSA's creditors on account of that equity value.  The UCC Allocation is not contingent on the ultimate amount of allowed claims against MP Ireland; rather, the assumptions are "locked in" and value flows upstream to MIFSA

---

[43]    *See* Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2459 (line 7) – AA2461 (line 3); *see also* Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2518 (lines 10) – AA2519 (line 19).

[44]    *Id*.

regardless of the extent of allowed claims against MP Ireland.  The UCC Waterfall ignores Sanofi's Amended Claim (filed in the approximate amount of $189,000,000) and other known or anticipated claims, including anticipated rejection-damages claims, ignores that meaningful claims reconciliation has not occurred, and does not include a disputed claims reserve.[45]  A substantially increased allowed claims pool at MP Ireland should decrease the allocation to creditors of other Debtors, including MIFSA, but under the confirmed Joint Plan, the value allocated to MIFSA on account of its equity position in MP Ireland will already be distributed to Class 6(g) creditors, without any hope that MP Ireland's Class 6(f) creditors will be paid in full from proceeds of the intangible assets.[46]

The UCC relied on the output from the UCC Waterfall to justify its ultimate decision of how the Settlement Proceeds should be divvied up, resulting in the final

---

[45]    The record reflects the Debtors' financial advisor's testimony estimating Sanofi's claims for confirmation purposes to be $45,000,000. *See* Testimony of Randall Eisenberg, Hearing Transcript, Dec. 9, 2021, AA2088 (lines 9-21).  While still undervaluing Sanofi's claim, this demonstrates the unreasonableness of the UCC Waterfall's assumption of only $14,000,000 of Class 6(f) claims at MP Ireland, *in the aggregate*.

[46]    *See e.g.*, Testimony of Randall Eisenberg, Hearing Transcript, Dec. 9, 2021, AA2163 (lines 15-19) (confirming that even if Sanofi is allowed a claim in excess of $100,000,000 against MP Ireland, the Initial Fixed Distribution of $57,000,000 will still be made to MIFSA's Class 6(g) creditors.

UCC Allocation and Initial Fixed Distribution.[47]  For example, the UCC Waterfall, with its outdated unreasonable assumptions of allowed claims, "predicts" that if the Settlement Proceeds ultimately equal $200,000,000,[48] then creditors in Class 6(g) would receive a total distribution of $57,000,000.  This distribution derives from Class 6(g)'s claims against MIFSA.[49]  The Initial Fixed Distribution provides for an immediate, Effective Date distribution of $57,000,000 to Class 6(g) creditors, most of which comes from value first allocated to MP Ireland, even though MP Ireland is not solvent (and if it was, Sanofi's claim would be paid in full).

---

[47]      *See* Confirmation Order, AA590-598 (Exhibit 6 to Joint Plan); Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2514 (line 14) – AA2515 (line 12).

[48]      Of the Settlement Proceeds, $10,000,000 of the $135,000,000 cash component is reserved for costs of administering the post-confirmation "GUC Trust," (as defined in the Joint Plan) leaving $125,000,000 in cash for distribution. The record reflects that the UCC speculates that monetization of the intangible assets may result in further cash proceeds of $75,000,000.  *See* Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2406 (line 22) – AA2407 (line 4).

[49]      *See* Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2448 (line 15) – AA2449 (line 21); *see also* Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2518 (lines 3-9).  In particular, Mr. Madden testified that, under the UCC Waterfall 57% of the Debtors' total value, over $4,000,000,000 is allocated to MP Ireland, but because the assumed extent of Class 6 claims against MP Ireland totaled only $14,000,000, the UCC Waterfall assumes that such claims will be paid in full and then proceeds to allocate the balance of the MP Ireland value to MIFSA on account of its presumed "in-the-money" equity position at MP Ireland.  Mr. Greenberg, the UCC's financial advisor, acknowledged this equity allocation within the UCC Waterfall.

### D. Sanofi's Objection to Confirmation

The Bankruptcy Court entered pretrial orders,[50] bifurcating the confirmation hearing into two "phases." Phase 1 was limited to issues of valuation, noticing and voting,[51] whereas Phase 2 included issues related to satisfaction of the requirements for confirmation under section 1129 of the Bankruptcy Code and the UCC Settlement and UCC Allocation.[52]

Sanofi timely filed objections to confirmation on October 13, 2021, and November 1, 2021.[53]   The second, as required by scheduling orders entered by the Bankruptcy Court, was limited to objections related to the UCC Allocation ("**Supplemental Objection**").   In these objections, Sanofi asserted that the Joint Plan discriminates unfairly and through the distribution scheme directed by the UCC Allocation violates the absolute priority rule.[54]

### E. The Bankruptcy Court's Confirmation Ruling

In its Revised Opinion, the Bankruptcy Court held that the Joint Plan does not violate the absolute priority rule, because "holders of Class 5 claims are making a

---

[50]     *See* AA3093-3136; D.I. 5510 and 5511.

[51]     *See* AA3098-3099; D.I. 5510.

[52]     *See* AA3111-3116; D.I. 5511.

[53]     *See* AA2014-2038 and AA3137-3149; D.I. 4702 and 5101.

[54]     *See* AA2031-2032; D.I. 4702 (unfair discrimination) and AA3147-3148 (absolute priority rule).

gift directly to the Class 6(g)."[55] To reach this result, the Bankruptcy Court noted that "Debtors' Waterfall scenarios show that [MP Ireland] is not providing any recovery to MIFSA."[56]  The Bankruptcy Court committed legal error by classifying a portion of the Settlement Proceeds as a gift, by improperly relying on the *Debtors' waterfall* to determine how such "gift" was being allocated, and by concluding that a gift need not be distributed in compliance with the absolute priority rule. The Revised Opinion does not include any discussion of the actual mechanics of the UCC Allocation or UCC Waterfall, which dictate the distribution of the Settlement Proceeds, subject to the Joint Plan's savings clause.

With respect to unfair discrimination, the Bankruptcy Court did not consider Sanofi's objection, stating that "[w]hile Sanofi made the argument during the Confirmation Hearing that its claims should be compared with Class 6(g), that argument was not included in Sanofi's objections and therefore need not be considered."[57]  Sanofi raised this objection and presented evidence with respect to it at the Confirmation Hearing.[58]

---

[55]     Revised Opinion, AA193; D.I.6378.

[56]     *Id*., AA194.

[57]     *Id.*, AA180; n. 199. The Bankruptcy Court did not cite any cases in support of its decision not to consider Sanofi's objection.

[58]     *See*, *e.g.*, Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2463 (line 10) – AA2469 (line 6); Testimony of Randall Eisenberg, Hearing Transcript, Dec. 9, 2021, AA2163 (lines 15-19); Closing Argument, Hearing Transcript, January 4, 2022, AA2801 (lines 21-25), AA2806 (line 1) - 2809 (line

During the confirmation hearing, Sanofi asserted that, for purposes of analyzing the absolute priority rule, the Court should consider the extent of Sanofi's Amended Claim. In its Revised Opinion, the Bankruptcy Court stated in a footnote that "to ensure that the record is perfectly clear on this point, I will note that the only valid proof of claim on file by Sanofi is its original proof of claim stating a claim for $45 million. Its purported amended proof of claim in which it states a claim for $189 million is invalid, as it was filed long after the bar date (and after confirmation proceedings had begun) without leave of court."[59] The Bankruptcy Court erred by not accepting Sanofi's Amended Claim (or at least the Debtors' own assumptions of at least $90,000,000 of Class 6(f) claims at MP Ireland) for purposes of evaluating the UCC Allocation and requiring it to be adjusted as expressly contemplated by the Joint Plan's safety-valve provision.[60]

---

21), AA2818 (lines 11-14), AA2822 (lines 4-6), and AA 2830 (line 5) to AA2833 (line 14).

[59]     Revised Opinion, AA172-173; D.I. 6378, n. 178.

[60]     At Sanofi's request, the Bankruptcy Court included in the Confirmation Order the following clarification: "The reference to a $45 million claim in footnote 178 of the Confirmation Opinion reflects the value (for Confirmation Hearing trial purposes only) of Sanofi's claim as testified by Mr. Eisenberg. The rights of all parties are expressly reserved with respect to allowance or disallowance of Sanofi's claims." Confirmation Order, AA394; D.I. 6660. The Bankruptcy Court apparently either mistakenly believed that Sanofi had filed a proof of claim for $45,000,000, or, alternatively, concluded that the Debtors' internal estimate of the value of Sanofi's claim, undertaken without a motion under Fed. R. Bank. P. 3018 or section 502(c) of the Bankruptcy Code, should be determinative of the allowed amount of such claim. Either conclusion was erroneous.

## I.    SUMMARY OF THE ARGUMENT

The Bankruptcy Court committed reversable error by confirming the Joint Plan, because the UCC Allocation violates the absolute priority rule codified in section 1129(b)(2)(B) of the Bankruptcy Code, by its terms and in its application. The Joint Plan, through its inclusion of the UCC Allocation, allocates substantial value to MP Ireland, but then diverts that value to MIFSA, to pay holders of claims in Class 6(g), solely because of MIFSA's equity interest as the parent of MP Ireland. This violates the absolute priority rule and should be reversed.

The Bankruptcy Court also committed reversible error, by ignoring the mechanics of the UCC Allocation and holding that the UCC Allocation need not comply with the absolute priority rule, because a portion of the Settlement Proceeds should be deemed a "direct gift" to MIFSA Class 6(g) from holders of claims in Class 5.  Even if the Settlement Proceeds are a gift, binding Third Circuit precedent nonetheless requires that a plan distribute a gift in compliance with the absolute priority rule.[61]

The Bankruptcy Court also committed reversible error in approving the UCC Allocation because it causes the Joint Plan to discriminate unfairly by providing disproportionately favorable treatment to certain structurally subordinate subclasses

---

[61]    *Armstrong*, *supra*.

within Class 6 to the detriment of creditors in Class 6(f) of the MP Ireland plan, who rejected and objected to the Joint Plan.

Finally, the Bankruptcy Court committed error by determining that Sanofi's Amended Claim is invalid, despite no objection having been filed to the Amended Claim.  This is so, because in the absence of an objection, the Amended Claim is *prima facie* valid and allowable, unless and until objected to after which Sanofi would be entitled to prove its claim in accordance with the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

## II.        ARGUMENT

### A. The Bankruptcy Court Committed Legal Error by Confirming the Joint Plan, Because the UCC Allocation Violates the Absolute Priority Rule

Section 1129(b)(1) of the Bankruptcy Code provides that, for any impaired class of claims that votes to reject a plan, the plan must not discriminate unfairly and must be fair and equitable with respect to such class.[62]  Section 1129(b)(2)(B) of the Bankruptcy Code, in turn, which codifies the "absolute priority rule," provides that "fair and equitable" means, with respect to each rejecting class of unsecured claims, that the plan must provide that (i) each holder of a claim in such class will "receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the amount of such claim" or (ii) the holder of any junior claim or interest will not receive or retain under the plan on account of such junior claim any property or interest.[63]  In short, the absolute priority rule requires that, if creditors in a rejecting class will receive less than full value for their claims, then no holder of junior claims or interests may receive or retain property under the plan.[64]  As the

---

[62]    11 U.S.C. § 1129(b)(1).

[63]    11 U.S.C. § 1129(b)(2)(B).

[64]    *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999); see also *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (concluding that "the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.") (citations omitted); *see also Armstrong*, 432 F.3d at 512.

Bankruptcy Court correctly acknowledged in its Revised Opinion, "under the absolute priority rule, equity holders cannot receive a distribution unless dissenting unsecured creditors receive payment in full or consent to such treatment."[65]

### 1. *The UCC Allocation Violates the Absolute Priority Rule*

The UCC Settlement designates a pot of the *Debtors' property* for distribution to creditors in the seven Class 6 subclasses against the Debtors.[66]   The UCC Allocation, implementing the UCC Settlement, dictates how the Settlement Proceeds will be allocated.  First the UCC Waterfall (defined below) splits the pot among the various Debtors, and then the UCC Allocation splits each Debtor's share of the pot to creditors of each Debtor.[67]   The first step of the UCC Allocation was that "[t]he UCC's professionals constructed a creditor recovery model (the "**UCC Waterfall**") which valued assets and claims at, and estimated recoveries to creditors of, each Debtor entity and non-Debtor affiliate in accordance with the absolute priority rule and based on certain assumptions."[68]

The UCC Allocation is based on the UCC Waterfall, which attributes 57% of the Debtors' total value to MP Ireland and then, because Class 6 claims against MP

---

[65]    Revised Opinion, AA193; D.I. 6378, *citing Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978 (2017).

[66]    Confirmation Order, AA525; D.I. 6660 (Joint Plan, Art. IV.HH(4)).

[67]    Confirmation Order, AA590-598; D.I. 6660 (Exhibit 6, UCC Appendix).

[68]    *Id.*,  A.A.  591.

Ireland were assumed to be only $14,000,000, permits an equity distribution from MP Ireland to its parent, MIFSA, but significantly without first ensuring that MP Ireland's unsecured creditors are paid or provided for in full.[69]  And the Initial Fixed Distribution of $57,000,000 to Class 6(g) claimants is made on account of their claims against MIFSA, which only receives value in the UCC Allocation on account of its equity interest in MP Ireland.[70]

On these facts, the Bankruptcy Court committed legal error by confirming a plan that provides for a distribution to Class 6(g) claimants at MIFSA from value allocated to MIFSA on account of its equity interest in MP Ireland, based on the unreasonable and outdated assumption that only $14,000,000 of Class 6(f) claims will be allowed against MP Ireland, and without first ensuring that MP Ireland's actual allowed unsecured creditors are paid in full.[71]  The failure to permit the MP Ireland Class 6(f) recovery to slide with the extent of the allowed claims in such class (with a corresponding reduction in MIFSA's Class 6(g) recovery) erroneously locks in a deficient recovery to MP Ireland Class 6(f) and violates the absolute

---

[69]    *See e.g.*, Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2448 (line 8) – AA2449 (line 1), AA2459 (line 7) – AA 2461 (line 3); Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2517 (line 14) – AA2519 (line 19).

[70]    *See* Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2518 (line 22) -AA2519 (line 19).

[71]    11 U.S.C. § 1129(b)(2)(B); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978 (2017).

priority rule. Stated another way, MIFSA's equity interest in MP Ireland is indisputably a junior equity interest, relative to Class 6(f) claims against MP Ireland, and taking value properly allocated for MP Ireland's creditors and then up-streaming it via equity dividend to MIFSA violates the absolute priority rule.[72]

### 2. Alternatively, the Bankruptcy Court Erred by Creating an Unlawful "Gift" Exception to the Absolute Priority Rule

In overruling Sanofi's absolute priority rule objection, the Bankruptcy Court agreed with the Debtors that "the Plan does not provide for any equity distributions to MIFSA; instead, holders of Class 5 claims are making a gift directly to the Class 6(g)."[73] Despite that the distribution to Class 6(g) derives from the UCC Waterfall, the Court explained its conclusion: "Debtors' Waterfall scenarios show that MP [Ireland] is not providing any recovery to MIFSA."[74] The Court's reliance on the *Debtors'* waterfall analyses, which have nothing to do with the UCC Allocation, including how value is attributed to MIFSA Class 6(g) from MP Ireland within the UCC Allocation, is legal error. The UCC Allocation is built on the *UCC Waterfall*,

---

[72]     *See, e.g., Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208-09 (1998) (noting that under a reorganization plan, an owner cannot retain its interest where creditors are not paid in full and those creditors refuse to accept the plan).

[73]     Revised Opinion, AA193; D.I. 6378. The Bankruptcy Court erred by finding a gift where none exists, and then compounded such error by creating an exception to the absolute priority rule in violation of the Third Circuit's precedent in *Armstrong*, *supra*.

[74]     *Id*., AA194; D.I. 6378.

not the Debtors' waterfall and the UCC Waterfall locks in an equity dividend from MP Ireland to MIFSA.

Regardless of whether the Settlement Proceeds constitute a "gift," there was no evidence presented that such a gift was directed to a specific subclass of Class 6 of a specific Debtor, no evidence that a specific portion of the Settlement Proceeds constituted a gift, and no evidence that any or all other funds being distributed on the Effective Date of the Joint Plan constitute gifts to all of the other parties receiving value before Class 5 receives the equity in the reorganized Debtors. The record is simply devoid of such evidence. Instead, the record includes evidence that the UCC Settlement was ostensibly achieved for the benefit of all subclasses of Class 6 of all Debtors. Consistent with this, one of the fundamental points of the UCC Waterfall was that it was intended to comply with the absolute priority rule.[75] In fact, to ensure that the rest of the Joint Plan would not be at risk if the UCC Allocation was improper, the Joint Plan includes a safety valve – expressly authorizing the adjustment of the UCC Allocation to ensure compliance with the Bankruptcy Code.[76]

Even if some of the Settlement Proceeds somehow could be construed as a "gift" from Class 5, despite such a construction finding no support in the Joint Plan,

---

[75]    Confirmation Order, AA590-598; D.I. 6660 (Exhibit 6, UCC Appendix).

[76]    Confirmation Order, AA473; D.I. 6660 (the savings clause provides that recoveries for the Class 6 subclasses are, "subject to adjustment to the allocation . . . solely to ensure that the recoveries of each Class 6 subclass satisfies the

the Bankruptcy Court committed legal error by approving the UCC Allocation, because gifts must still be distributed under a plan in accordance with the absolute priority rule.  The absolute priority rule is absolute; there is no "gifting" exception to the absolute priority rule.[77]

In *Armstrong*, the debtor proposed a plan with a provision that distributed warrants to the debtor's equity holders by permitting a class of asbestos claimants to "gift" those warrants to the equity class, skipping the general unsecured creditor class.[78]  The Third Circuit held that "the plain language of the statute [11 U.S.C. § 1129(b)(2)(B)(ii)] makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired . . . ."[79]  In short, the Third Circuit determined that the legislative history of section 1129(b) of the Bankruptcy Code was "at least designed to address 'give-up' situations where a senior class gave property to a class junior to the dissenting class."[80]  As applied, the *Armstrong* Court noted:

> Under the plan at issue here, an unsecured creditor class would receive and automatically transfer warrants to the holder of equity interests in the event that its co-equal class rejects the

---

requirements of the Bankruptcy Code . . . .").  The Joint Plan does not include any reference to a gift.

[77]    *Armstrong*, 432 F.3d at 514.

[78]    *Id*. at 509.

[79]    *Id*. at 513.

[80]    *Id*.

31

reorganization plan.  We conclude that the absolute priority rule applies and is violated by this distribution scheme.[81]

The distribution scheme proposed by the Debtors through the Joint Plan's incorporation of the UCC Allocation is equally violative of the absolute priority rule as the circumstances addressed in *Armstrong*.  In *Armstrong*, the proposed gift was of debtor property being initially conveyed to the "grantor" party, unsecured class of creditors, before being gifted to junior equity holders.  The Debtors' and UCC's gifting argument is that the Settlement Proceeds carved out from the Debtors' enterprise will effectively decrease the balance of cash on hand of the reorganized Debtors, as will all distributions and settlements under the Joint Plan, thus decreasing the value of the equity being distributed to holders of Class 5 claims.  Even if this reduction in value could be deemed a gift, under *Armstrong*, the allocation of that gift of the Debtors' property must still comply with the absolute priority rule.  The Bankruptcy Court committed legal error in overruling Sanofi's absolute priority rule objection based on its conclusion that the distribution of a portion of the Settlement Proceeds to Class 6(g) constituted a gift from Class 5.

### B. The Bankruptcy Court Erred in Confirming the Joint Plan Because the UCC Allocation Unfairly Discriminates Against Sanofi

As articulated by the Third Circuit Court of Appeals, analysis of whether a

---

[81]     *Id*. at 514; *see also In re BDSD North America, Inc*., 634 F.3d 79, 100-101 (2d Cir. 2011)

plan "discriminates unfairly" requires "a horizontal comparative assessment applied to similarly situated creditors (here unsecured creditors) where a subset of those creditors is classified separately, does not accept the plan, and claims inequitable treatment under it."[82] "'Discriminate unfairly' is simple and direct: you can treat differently (discriminate) but not so much as to be unfair. There is, as is typical in reorganizations, a need for flexibility over precision. The test becomes one of reason circumscribed so as not to run rampant over creditors' rights."[83]

In *Tribune*, the Third Circuit highlighted a number of principles to guide lower courts in their application of the unfair discrimination test.  Among other things, the Third Circuit explained:

> Courts and commentators nearly always consider this a comparison between the allegedly preferred class and the dissenting class . . . . However, as was done in this case, a court may in certain circumstances consider the difference between what the dissenting class argues it is entitled to recover and what it actually received under the plan.  In other words, a comparison between the recovery of the preferred class and the dissenting class is by far the preferred but not always the only acceptable approach." [84]

The Third Circuit also noted that to presume unfair discrimination, "there must

---

[82]     *In re Tribune Company*, 972 F.3d 228, 232 (3d Cir. 2020), citing Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11,* 72 Am. Bankr. L.J. 227, 227-28 (1998).

[83]     *Tribune*, 972 F.3d at 242.

[84]     *Id.*

be "a 'materially lower' percentage recovery for the dissenting class or a 'materially greater risk to the dissenting class in connection with its proposed distribution."[85]

The record reflects that a $57,000,000 distribution to MIFSA Class 6(g) is derived from the UCC Waterfall's prediction of the *pro rata* recovery to such class if distributable Settlement Proceeds ultimately equal $200,000,000.  But the record also reflects that this is based on an assumed unsecured claims pool of only $14,000,000 at MP Ireland.  If claims allowed in MP Ireland Class 6(f) are significantly greater, then the *pro rata* allocation to Class 6(f) at MP Ireland would increase and allocation to Class 6(g) at MIFSA would significantly decrease.  Accordingly, the relative baseline recoveries for MP Ireland Class 6(f) and MIFSA Class 6(g) are necessarily dependent on the reconciliation of claims at MP Ireland – which has not yet occurred and is not accommodated under the Joint Plan. Ignoring this, the Initial Fixed Distribution provides for an immediate payment to MIFSA Class 6(g) in an amount that would require both: (i) MP Ireland Class 6(f) claims to be allowed in a much lower amount than currently asserted and (ii) recovery of at least $75,000,000 on the intangible asset component of the Settlement Proceeds.  As both of these are at best uncertain, providing MIFSA Class 6(g) a guaranteed distribution of 100% of their projected recovery under the UCC Waterfall on the Effective Date shifts "materially greater risk" onto 6(f) at MP

---

[85]     *Id.*

Ireland.[86]

At trial, Sanofi argued that the Joint Plan should not be confirmed because the UCC Allocation discriminates unfairly against Sanofi as a Class 6(f) creditor of MP Ireland.[87]  In particular, it is unfair to provide a $57,000,000 immediate distribution to Class 6(g) claimants, when a fair, *pro rata* distribution on account of such claims would be much less under the UCC Waterfall once actual allowed claim amounts are considered for Sanofi and other ignored Class 6(f) creditors of MP Ireland.[88]  It is also unfair to allocate $18,000,000 to holders of Class 6(c) asbestos claims in the Initial Fixed Distribution, especially since the UCC Waterfall indicates that the maximum fair, *pro rata* distribution for those claims would be, at most $3,800,000;[89] this disproportionate guaranteed distribution to Class 6(c) takes value from other Class 6 creditors, including Sanofi.

It is also unfair to provide immediate distributions to holders of claims in Classes 6(b), 6(c), 6(d) and 6(g) based on their estimated recoveries from an

---

[86]    *Id.*

[87]    *See* Closing Argument, Hearing Transcript, January 4, 2022, AA2801 (lines 21-25), AA2806 (line 1) - 2809 (line 21), AA2818 (lines 11-14), AA2822 (lines 4-6), and AA 2830 (line 5) to AA2833 (line 14).

[88]    *See* Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2517 (line 19) – AA2518 (line 9); AA2526 (line 10) – AA2531 (line 4), and AA2535 (line 20) – AA2537 (line 16).

[89]    *See* Confirmation Order AA594 (UCC Appendix to Joint Plan, Table 2).

estimated $200,000,000 pot, as there is no certainty that the monetization of the intangible assets will yield an additional net $75,000,000. As such, the UCC Allocation unfairly shifts the risk of a lower recovery onto claimants in Classes 6(a), 6(e) and 6(f), who will be forced to wait until such assets are monetized to receive most of their recoveries.[90] This unfair discrimination is particularly egregious because the parties who are benefitting from the disproportionate recoveries are the Class 6 subclasses who had direct representation through UCC committee members, whereas no committee members held claims in Class 6(f) or against MP Ireland.[91]

The Bankruptcy Court committed legal error by confirming the Joint Plan that incorporates the UCC Allocation that discriminates unfairly as to MP Ireland Class 6(f), which rejected the Plan.[92]

---

[90]   *See Tribune*, 972 F.3d at 241, 243 (noting potential presumption of unfair discrimination based on differing risks); *see also Matter of D&F Construction Inc.*, 865 F.2d 673, 675 (5th Cir. 1989).

[91]   *See*, *e.g.*, Testimony of Mark Greenberg, Hearing Transcript, Dec. 14, 2021, AA2468 (line 12) - AA2469 (line 6).

[92]   The Bankruptcy Court's only reference to Sanofi's unfair discrimination argument is in footnote 199 of the Revised Opinion, which states that "While Sanofi made the argument during the Confirmation Hearing that its claims should be compared with Class 6(g), that argument was not included in Sanofi's objections and therefore need not be considered." The Bankruptcy Court did not cite any authority for this conclusion.

## C. The Bankruptcy Court Erred by Holding that Sanofi's Amended Claim is Invalid

Section 502(a) of the Bankruptcy Code provides that "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."[93]   Section 502(b), in turn, provides that "if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount . . . ."[94] Here, it is undisputed that the Amended Claim was filed, no objection was filed or otherwise asserted to the Amended Claim, and Sanofi was not afforded notice and an opportunity for a hearing before the Court's issuance of the Revised Opinion, including the language in footnote 178 stating that the Amended Claim is invalid.

Moreover, Rule 3007 of the Federal Rules of Bankruptcy Procedure provides that "[a]n objection to the allowance of a claim and a notice of objection that substantially conforms to the appropriate Official Form shall be filed and served at least 30 days before any scheduled hearing on the objection or any deadline for the claimant to request a hearing."[95]   There is no evidence in the record (or of which the Bankruptcy Court could have taken judicial notice) that any objection was ever filed to Sanofi's original proof of claim or the Amended Claim, or that any such objection

---

[93]   11 U.S.C. § 502(a).

[94]   11 U.S.C. § 502(b)

[95]   Fed. R. Bankr. P. 3007.

and a notice of objection was filed and served at any time, because there was none (and no hearing was held).

In addition, even beyond failure to adhere to any procedural due process requirements for objections to claims, the allowability of Sanofi's Amended Claim was not addressed during the confirmation trial or briefing. The only evidence related to the Amended Claim was presented by Sanofi's expert witness, Mr. Madden, who testified that the Amended Claim had been filed.[96] Sanofi noted during closing that the Amended Claim had been filed and had not yet been objected to.[97] Sanofi expressly argued "the ultimately allowed size of Sanofi's claim is not at issue for confirmation" and that "just because a plan suggests a different claim valuation, that's not a proper substitute for an actual claim objection."[98]

If anything, the Bankruptcy Court appears to have taken the Debtors' argument at trial – which was that they believed it was reasonable to estimate Sanofi's claim at $45,000,000 for purposes of evaluating the confirmation requirements (without having undertaken any process under Fed. R. Bankr. P. 3018) – and then taken their argument several steps further by actually adjudicating the

---

[96]     *See* Testimony of John P. Madden, Hearing Transcript, December 15, 2021, AA2580 (line 20) -AA2581 (line 25).

[97]     *See* Closing Argument, Hearing Transcript, January 4, 2022, AA2810 (lines 1-7).

[98]     *Id*., AA2810 (lines 11-17); *In re Linkous*, 141 B.R. 890, 898 (D. W.D. Va. 1992).

validity of the Amended Claim, as opposed to considering the value only to the extent needed for purposes of confirmation.

Accordingly, the Bankruptcy Court committed legal error by holding that Sanofi's Amended Claim is invalid, and should be reversed.

### III.    CONCLUSION

For the reasons set forth herein, Sanofi respectfully requests that this Court reverse the Bankruptcy Court's Confirmation Order as it relates to approval of the UCC Allocation and authorization of the Initial Fixed Distribution, and direct the Bankruptcy Court to enter an Order, consistent with the terms of the Joint Plan adjusting the UCC Allocation to ensure compliance with the Bankruptcy Code,[99] directing the GUC Trustee to distribute or reserve the Settlement Proceeds to holders of claims in Class 6(f) of MP Ireland in accordance with the absolute priority rule, including, without limitation, that all amounts allocated to MP Ireland under the UCC Waterfall be paid to Class 6(f) creditors of MP Ireland, and that such funds not be allocated or otherwise distributed to MIFSA or Class 6(g) creditors of MIFSA before all Class 6(f) Claims against MP Ireland are paid or provided for in full. Further, the Court should hold that Sanofi's Amended Claim is not invalid, but is instead a *prima facie* valid claim and should have been considered allowed during the Confirmation trial.

---

[99]    *See* fn. 77, *supra*.

Dated: May 9, 2022                    **DLA PIPER LLP (US)**

*/s/   Stuart M. Brown*
Stuart M. Brown (DE #4050)
R. Craig Martin (DE #5032)
Aaron S. Applebaum (DE #5587)
1201 North Market Street, Suite 2100
Wilmington, DE  19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail:  stuart.brown@us.dlapiper.com
          aaron.applebaum@us.dlapiper.com

        - and –

Ilana H. Eisenstein
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia PA  191903-7300
Telephone:  215-656-3300
Email:  ilana.eisenstein@us.dlapiper.com

*Attorneys for sanofi-aventis U.S. LLC*

## <u>RULE 8015(h)CERTIFICATION</u>

Pursuant to Fed. R. Bankr. P. 8015(h), I certify that this brief complies with the Type-Volume Limitation of Fed. R. Bankr. P. 8015(a)(7).  This brief contains 9,042 words, excluding parts of the document excluded by Fed. R. Bankr. P. 8015(g).


Dated: May 9, 2022 	 */s/    Stuart M. Brown*